**Ruben ELHARD, Plaintiff and Appellant,**

v.

**PRAIRIE DISTRIBUTORS, INC., Darwin Paczkowski; Mandan Security Bank; and Tappan Company, Defendants and Appellees.**

**Civ. No. 10780.**

Supreme Court of North Dakota.

April 17, 1985.

William C. Severin, Bismarck, for plaintiff and appellant.

Bair, Brown & Kautzmann, Mandan, for defendant and appellee Mandan Security Bank; argued by Malcolm Brown.

William C. Worthington, Jr., Bismarck, and Thomas M. Disselhorst, Bismarck, for defendant and appellee Tappan Company; argued by Thomas M. Disselhorst. Appearance by William C. Worthington, Jr.

MESCHKE, Justice.

Ruben Elhard has appealed a district court judgment dismissing his complaint against Mandan Security Bank (MSB) and Tappan Company (Tappan) in an action involving the priority of competing security interests. We reverse and remand.

In 1978, Northwestern Sales, Inc. (Northwestern), an appliance distributor, through

Elhard, its president, and Prairie Distributors, Inc. (Prairie), through Darwin Paczkowski, its president, engaged in a series of transactions to transfer Northwestern's business, inventory, and other assets to Prairie.

On March 31, 1978, Northwestern leased its business assets other than inventory to Prairie for a term ending on September 30, 1978. The lease agreement granted Prairie an option to purchase the leased assets for $125,000 until October 1, 1978. The agreement provided that if the option were exercised

> "the LESSEE will execute a promissory note payable to the LESSOR and will pledge the assets, proceeds, accounts receivable, and inventory owned as security for the promissory note subject to the first priority granted to a chattel mortgage lender and will execute an appropriate security agreement."

Also on March 31, 1978, Northwestern sold its inventory to Prairie. Northwestern and Prairie executed a bill of sale and agreement providing that the unpaid balance of the purchase price was due by September 30, 1978, and reciting that:

> "This agreement is made concurrent with an agreement between the parties hereto for the lease and option to purchase the business assets of NORTHWESTERN. NORTHWESTERN hereby retains a security interest in the inventory conveyed hereunder and all assets, inventory and all after acquired inventory, accounts receivable, and proceeds of PRAIRIE'S business to secure payment by PRAIRIE of the balance of the sum required under the terms of this agreement. However, NORTHWESTERN will subordinate its interest in said inventory to a first priority chattel mortgage lender as may reasonably be required by PRAIRIE from time to time."

On April 17, 1978, Prairie executed a promissory note for $125,000 to Northwestern. The note recited that "PRAIRIE DISTRIBUTORS, INC., has executed a separate security agreement and financing statement to secure this note." Northwestern filed a financing statement with the Morton County Register of Deeds on April 19, 1978, and with the secretary of state on June 21, 1978. MSB, which financed part of Prairie's purchase and took a security interest in Prairie's accounts receivable and inventory, filed a financing statement with the secretary of state on May 10, 1978. On March 2, 1979, Northwestern assigned to Elhard, its sole shareholder, all of its rights and interests, including the $125,000 promissory note and "all security interests and financing statements" executed by Prairie in favor of Northwestern.

In May of 1979, Prairie began doing business with Tappan and they executed a security agreement on May 11, 1979. Tappan notified MSB in writing that it had or expected to acquire a purchase money security interest in Prairie inventory, but did not so notify Elhard or Northwestern. Tappan filed a financing statement with the secretary of state on June 18, 1979.

Prairie ceased doing business in 1982 and defaulted on the promissory note to Northwestern. MSB began the process of liquidation. Tappan inventory not paid for was returned to Tappan, which credited Prairie's account therefor in the amount of $20,809. Some equipment was returned to Elhard, who sold it and applied the proceeds to Prairie's debt, leaving a balance due of $89,147.39. MSB sold Prairie's inventory and accounts receivable and retained the proceeds.

Elhard brought suit against Prairie, Paczkowski, MSB, and Tappan. The trial court (1) determined that Tappan had priority over Elhard in the unpaid Tappan inventory; (2) determined that MSB had priority over Elhard in Prairie's accounts receivable and display kitchens; and (3) dismissed Elhard's complaint against Tappan and MSB.[1]

The following issues have been raised: (1) Whether there was a valid security agreement between Northwestern and Prairie; (2) Whether Tappan was required

---

**1.** Prairie and Paczkowski are not involved in    this appeal.

to notify Northwestern in writing in order to gain priority over Northwestern's security interest in inventory; (3) Whether Elhard was required to file his assignment from Northwestern; (4) Whether the proper place to file to perfect a security interest in accounts was with the local register of deeds or with the secretary of state; and (5) Whether five "display kitchens" constituted equipment or inventory.

1. Was there a valid security agreement between Northwestern and Prairie?

■ Section 41–09–05(1)(1), N.D.C.C., [§ 9–105(1)(1), U.C.C.] defines a security agreement as "an agreement which creates or provides for a security interest." Section 41–01–11(37), N.D.C.C., [§ 1–201(37), U.C.C.] defines a security interest as "an interest in personal property or fixtures which secures payment or performance of an obligation." Section 41–09–16(1), N.D. C.C., [§ 9–203(1), U.C.C.] provides the formal requisites necessary to render a nonpossessory security interest enforceable:

"1. ... a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless all of the following take place:

a. ... the debtor has signed a security agreement which contains a description of the collateral ....

b. Value has been given.

c. The debtor has rights in the collateral."

"[T]he Code requires 'no magic words or precise form' to evidence a possible security interest." J. White & R. Summers, Uniform Commercial Code § 23–3 (2d Ed.1980).

"... When the words 'security interest' are used, there is no question but that it means security interest as defined by the law existing when the contract is made, which means the Uniform Commercial Code.... Consequently all that the agreement need do is indicate that the creditor has a security interest in particular property which happens to be personal property or fixtures. When this much is established, Article 9 of the Code comes into operation without any further statement by the parties."

4 R. Anderson, Uniform Commercial Code § 9–203:7 (2d Ed.1971).

The March 31, 1978, bill of sale and agreement signed by Prairie specifically recites that "NORTHWESTERN hereby retains a security interest in the inventory conveyed hereunder and all assets, inventory and all after acquired inventory." That language sufficiently creates a security interest. Tappan has not asserted that it was misled by the March 31, 1978, bill of sale and agreement, and does not dispute that value was given and that Prairie had rights in the collateral.

Tappan contends, however, that the March 31, 1978, bill of sale and agreement does not constitute a security agreement because it does not state under what conditions the security interest could be foreclosed or state the rights of the parties. In our view, the failure to state under what conditions the security interest could be foreclosed or to describe the rights of the parties does not invalidate the security agreement. Section 41–09–47, N.D.C.C., [§ 9–501, U.C.C.] provides:

*"41–09–47. (9–501) Default—Procedure when security agreement covers both real and personal property.*

1. When a debtor is in default under a security agreement, a secured party has the rights and remedies provided in this part and ... those provided in the security agreement. He may reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure.... The rights and remedies referred to in this subsection are cumulative.

2. After default, the debtor has the rights and remedies provided in this part, those provided in the security agreement and those provided in section 41–09–20 ...."

Thus, there are two sets of rights and remedies available to the parties to a security agreement: those provided in the security agreement and those provided in Part 5

of Chapter 41–09, N.D.C.C. *See* T. Quinn, Uniform Commercial Code Commentary and Law Digest ¶ 9–501[A] (1978). Unless "varied by agreement" [§ 41–01–02, N.D. C.C., (§ 1–102, U.C.C.) ], the provisions of Part 5 of Chapter 41–09, N.D.C.C., [Article 9, U.C.C.] are applicable. Because this security agreement did not state the rights and remedies of the parties, the provisions of Part 5 of Chapter 41–09, N.D.C.C., [Article 9, U.C.C.] were not "varied by agreement", and those provisions are, therefore, applicable by operation of law and form a part of the security agreement. We therefore conclude that there was a valid security agreement between Northwestern and Prairie.

### 2. Notification

■ Section 41–09–33(3), N.D.C.C., [§ 9–312(3), U.C.C.] provides:

"3. A perfected purchase money security interest in inventory has priority over a conflicting security interest in the same inventory ... if *all* of the following are met:

\* \* \* \* \* \*

b. *The purchase money secured party gives notification in writing* to the holder of the conflicting security interest...." [Emphasis added.]

It is undisputed that Tappan did not provide written notification to Northwestern. Tappan asserts that Northwestern's financing statement filed with the secretary of state was confusing because Darwin Paczkowski had signed it in two places: as president of Prairie and as president of Northwestern. The financing statement clearly indicated the name of the debtor, Prairie, and its Mandan address. It also clearly indicated the name of the secured party, Northwestern, and its Bismarck address. When Tappan's credit manager contacted him by telephone about the matter, Paczkowski assured him that there was "no problem."

Relying on *GAC Credit Corporation v. Small Business Administration*, 323 F.Supp. 795 (W.D.Mo.1971), Tappan argues that its credit manager's telephone conversation with Paczkowski adequately satisfied the provisions of § 41–09–33(3), N.D. C.C., [§ 9–312(3), U.C.C.] to give it priority over Northwestern in the Prairie inventory. Reliance on *GAC, supra*, is misplaced. That decision involved Missouri's codification of U.C.C. § 9–312 before it was amended in 1972 to require written notification. The 1972 amendment resolved prior uncertainty over whether or not notification could be oral by specifically requiring written notification. *See* J. White & R. Summers, Uniform Commercial Code § 25–5 (2d Ed.1980); B. Clark, The Law of Secured Transactions Under the Uniform Commercial Code § 3.9[3][a]. The written notification requirement of § 41–09–33(3), N.D.C.C., [§ 9–312(3), U.C.C.] is a "bright line" rule that promotes commercial certainty and ease in the filing process. A telephone call from a purchase money creditor to a debtor is insufficient notification to give the purchase money creditor priority over a conflicting security interest in the same inventory.

### 3. Filing of Assignment

■ Tappan asserts that, in order to claim priority, Elhard was required to file his assignment from Northwestern with the secretary of state. We disagree. The assignment from Northwestern to Elhard did not create a new security interest and was not itself intended for security. *See* § 41–09–23(2), N.D.C.C., [§ 9–302(2), U.C.C.] which provides:

"If a secured party assigns a perfected security interest, no filing under this chapter is required in order to continue the perfected status of the security interest against creditors of and transferees from the original debtor."

*See also* Uniform Commercial Code (U.L.A.) § 9–302, 1972 Official Comment. Elhard was not required to file his assignment.

### 4. Place of filing

■ Northwestern filed a financing statement with the Morton County Register of Deeds on April 19, 1978, and with the secretary of state on June 21, 1978.

MSB filed a financing statement with the secretary of state on May 10, 1978. The trial court determined that the proper place of filing for accounts receivable was with the secretary of state and that MSB's security interest had priority over Elhard's.

At the time the financing statements involved were filed in 1978, § 41–09–40(1), N.D.C.C., [§ 9–401(1), U.C.C.] provided:

> *"41–09–40. (9–401) Place of filing— Erroneous filing—Removal of collateral.*
>
> 1. The proper place to file in order to perfect a security interest is as follows:
>
> a. When the collateral is equipment used in farming operations, or farm products, or accounts, or general intangibles arising from or relating to the sale of farm products by a farmer, or consumer goods, then in the office of register of deeds in the county of the debtor's residence . . . .
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> c. In all other cases, in the office of the secretary of state."

The section was amended in 1983 by deleting the comma immediately following the word "accounts" in subsection 1(a); 1983 S.L., Ch. 82, § 87. Elhard asserts that "[t]he disjunctive nature of this subsection, as it existed in 1978, indicates that the proper place to file to perfect a security interest in accounts was with the register of deeds." We disagree. With or without the comma deleted in 1983, § 41–09–40(1)(a), N.D.C.C., [§ 9–401(1), U.C.C.] relates only to farm-related collateral and consumer goods. The collateral involved here is neither of those. Therefore, the proper place to file was in the office of the secretary of state. See Uniform Commercial Code (U.L.A.) § 9–401, 1972 Official Comment. Since MSB was the first to file in the office of the secretary of state, its security interest in accounts had priority over Elhard's. "Conflicting security interests rank according to priority in time of filing or perfection." Section 41–09–33(5)(a), N.D.C.C. [§ 9–312(5)(a), U.C.C.].

### 5. "Display kitchens"

The trial court determined that "Mr. Elhard in allowing these ["display kitchens"] to be removed from his property when he had the full capability to stop the same allowed them to be treated as inventory" and determined that MSB was entitled to the proceeds of their sale. Elhard's failure to prevent the removal of the display kitchens is not an adequate reason for treating the display kitchens as inventory. "The Code does not require a creditor to monitor the use of collateral." J. White & R. Summers, Uniform Commercial Code § 23–13 (2d Ed.1980).

Elhard asserts that those items were equipment or fixtures and that he was entitled to the proceeds from them because neither Tappan nor MSB claimed a security interest in equipment or fixtures. Northwestern's financing statement did not constitute a fixture filing under § 41–09–34, N.D.C.C., [§ 9–313, U.C.C.] or § 41–09–41(6), N.D.C.C., [§ 9–402(6), U.C.C.]. Section 41–09–09, N.D.C.C., [§ 9–109, U.C.C.] defines goods as equipment or inventory:

> "2. 'Equipment' if they are used or bought for use primarily in business . . . or if the goods are not included in the definitions of inventory, farm products, or consumer goods.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> "4. 'Inventory' if they are held by a person who holds them for sale or lease or to be furnished under contracts of service or if he has so furnished them, or if they are raw materials, work in process or materials used or consumed in a business. Inventory of a person is not to be classified as his equipment."

We said in *Benson County Cooperative Credit Union v. Central Livestock Association, Inc.*, 300 N.W.2d 236, 240 (N.D. 1980):

> "The intrinsic nature of the goods does not classify them; rather, it is the use to which the owner puts the goods, or intends to put them, that determines their classification."

The model kitchen display units involved were fastened to the store walls with screws and contained built-in appliances. The only testimony as to the use, either intended or actual, of the display kitchens indicates that they were equipment, not inventory.

We conclude that the trial court erred in determining that MSB, rather than Elhard, was entitled to the proceeds of the sale of the display kitchens.

For the reasons stated, the judgment is reversed and the matter is remanded for further proceedings consistent with this opinion.

ERICKSTAD, C.J., and LEVINE, VANDE WALLE and GIERKE, JJ., concur.