**D.G. PORTER, INC., Plaintiff and Appellee,**

v.

**Gaylord FRIDLEY, Defendant and Appellant.**

**Civ. No. 10803**

Supreme Court of North Dakota.

Sept. 4, 1985.

Mackoff, Kellogg, Kirby & Kloster, Dickinson, for plaintiff and appellee; argued by James D. Geyer, Dickinson. Appearance by Ward M. Kirby, Dickinson.

Greenwood, Greenwood & Greenwood, Dickinson, for defendant and appellant; argued by Dann E. Greenwood, Dickinson.

ERICKSTAD, Chief Justice.

The defendant, Gaylord Fridley, appeals from a judgment for damages awarded in favor of the plaintiff, D.G. Porter, Inc. (Porter), by the District Court of Stark County. Fridley has also appealed from an order denying his motion to disqualify Porter's counsel in this case. We reverse the

judgment and remand for further proceedings to redetermine Porter's damages, and we affirm the order denying Fridley's motion to disqualify Porter's counsel.

On December 5, 1983, the parties entered a written agreement whereby Fridley agreed to purchase from Porter a bar-cabaret-restaurant business known as the Esquire Club which is located in Dickinson. The sale of this ongoing business was conditioned upon the transfer to Fridley of the retail liquor license held by Porter. The sale included the assignment of the lease for the premises in which the business was conducted and a transfer of "the good will of the business as a going concern, stock in trade, furniture, fixtures and equipment, transferable insurance policies and all contracts which may have been entered into by Seller in connection with such business, and all other property (except cash and receivables) used by Seller in such business, ..." The agreed purchase price was $250,000 of which Fridley agreed to pay $50,000 on the closing date and the balance in four subsequent annual installments of $50,000 each. In addition, the agreement provided that Fridley would separately purchase the Esquire Club inventory at Porter's cost payable on the date the agreement was executed. The agreement provided that the retail liquor license would be transferred within 60 days from the date of execution of the agreement and that the final closing would then occur upon two day's notice from either party.

On the date the agreement was executed, Fridley took physical possession of the premises, paid approximately $33,000 for the inventory which was transferred to him, and commenced operating the business. On December 6, 1983, the lease of the business premises was assigned to Fridley, and on February 6, 1984, the retail liquor license was transferred to him.

On February 20, 1984, Fridley sent Porter a notice of his intent to rescind the purchase agreement. At that time no closing had occurred, and Fridley had not paid the $50,000 down payment. On April 1, 1984, Fridley vacated the premises and took with him the remaining inventory.

On March 5, 1984, Porter filed this action alleging that Fridley breached the agreement and seeking the agreed purchase price of $250,000. Fridley filed a counterclaim seeking rescission of the agreement and other appropriate relief on the ground that Porter had induced Fridley to purchase the Esquire Club by fraudulently misrepresenting its gross monthly income.

Following a bench trial, the court determined that Porter had not fraudulently induced Fridley to purchase the business but that Fridley had breached the agreement by failing to make the required $50,000 down payment and by noticing, without justification, his intent to rescind. The trial court entered a judgment awarding Porter the contract price of $250,000 plus interest and costs. In its judgment, the trial court also declared that Porter possesses a security interest in the Esquire Club entitling Porter to sell the business and to apply the proceeds, less reasonable expenses of resale, to the amount owed by Fridley.

On appeal from the judgment Fridley has raised, in essence, the following issues:

(1) Whether or not the trial court committed reversible error "in executing the findings of fact prepared by trial counsel";

(2) Whether or not the trial court's determination that Porter did not fraudulently induce Fridley to purchase the Esquire Club was clearly erroneous;

(3) Whether or not the trial court erred in its determination that the purchase agreement was not void for untimely transfer of the retail liquor license; and

(4) Whether or not the trial court applied an incorrect measure of damages.

Prior to discussing the foregoing issues, we will discuss and resolve Fridley's appeal from the trial court's order denying his motion to disqualify Porter's counsel. In this litigation, Porter is represented by Ward Kirby and James Geyer of the Mack-

off, Kellogg, Kirby & Kloster, P.C., Law Firm (Mackoff Law Firm). On June 13, 1984, eight days before the scheduled trial of this litigation, Fridley moved to disqualify the Mackoff Law Firm from representing Porter on the ground that two attorneys in the law firm, Gordon Schnell and Paul Kloster, had represented and continued to currently represent Fridley on other matters. Fridley asserts that Attorney Schnell represents him on an oil well matter and that Attorney Kloster represents him on a condemnation proceeding.

In response to those assertions, Attorneys Schnell and Kloster filed affidavits. Through affidavit, Attorney Schnell asserts that he has never been retained by nor represented Fridley. Schnell states that during 1983, he represented Gray Petroleum, Inc., to prepare "a Partial Assignment of Oil, Gas and Mineral Leases with Respect to an interest in the 'Emmons Wells' which was sold to Gaylord Fridley by Gray Petroleum, Inc." Schnell states that he has performed other legal work for Gray Petroleum, Inc., on behalf of William R. Everett who was a previous officer and director of Gray Petroleum, Inc. This work did involve determination of payments affecting Gray Petroleum, Inc., limited partnerships and Fridley.

Through affidavit, Attorney Kloster asserts that his only dealing with Fridley involved his representation of the estate of Rachel Fridley, Gaylord Fridley's mother, in a condemnation proceeding commenced by Northern Border Pipeline Company in federal court. Fridley was one of the personal representatives for the estate. That litigation was dismissed pursuant to a stipulation of dismissal during June 1982. Attorney Kloster states that his services for the estate were effectively terminated during December 1981. Kloster informed Fridley that under the settlement Northern Border Pipeline Company would be liable to pay for crop damages occurring in 1982 or subsequent crop seasons. Thereafter Kloster, communicating with Fridley about a possible claim for crop damages in 1982, informed Fridley that he would need additional information if he were to assist with this claim. When no additional information or communication was forthcoming, Kloster concluded that Fridley was not requesting his services and that no attorney/client relationship was thereby created.

■ Having reviewed the entire record on this matter, we conclude that the trial court did not abuse its discretion in denying Fridley's request to disqualify Porter's counsel in this litigation. It is readily apparent, upon reviewing the affidavits and other materials regarding this issue, that there was no possible conflict or impropriety which could have resulted from the Mackoff Law Firm's representation of Porter in this case in view of the unrelated and relatively inconsequential involvements that members of the Mackoff Law Firm may previously have had with Fridley.

■ On appeal from the judgment, Fridley asserts that the trial court committed reversible error "in executing findings of fact prepared by trial counsel." This Court has previously stated that it does not approve of the practice of a trial judge uncritically accepting proposed findings of fact drafted by counsel. *Schmidt v. Plains Electric, Inc.*, 281 N.W.2d 794 (N.D. 1979). We have also determined, however, that findings of fact will not be found clearly erroneous on appeal merely because they were prepared by counsel for the prevailing party and thereafter adopted verbatim by the trial judge. *Warner v. Johnson*, 213 N.W.2d 895 (N.D.1973). When the trial judge affixes his signature to the findings of fact they become the findings of the court irrespective of whether or not they have been prepared by counsel. *Vetter v. Vetter*, 267 N.W.2d 790 (N.D.1978). In this case, the trial judge requested proposed findings to be submitted by counsel for both parties, and the judge subsequently adopted the findings prepared by Porter's counsel. We conclude that the trial court's actions in this regard did not constitute reversible error.

■ Fridley asserts that the trial court's determination that Porter did not fraudulently induce him to purchase the

Esquire Club was clearly erroneous. The issue of fraud is treated as a question of fact, and the trial court's determination of that issue will not be set aside on appeal• unless it is clearly erroneous. *Hall GMC, Inc. v. Crane Carrier Company,* 332 N.W.2d 54 (N.D.1983); *Quandee v. Skene,* 321 N.W.2d 91 (N.D.1982). An allegation of fraud must be proved by evidence that is clear, satisfactory and convincing. *Jones v. Jones,* 310 N.W.2d 753 (N.D.1981).

Fridley asserts that prior to entering the purchase agreement Porter led him to believe that the business would generate $7,000 per month. He also alleges that prior to entering the agreement he was told by Ron Borg, the manager of the Esquire Club, that past monthly gross income from the Esquire Club operations had been $50,000—$60,000 in liquor and $10,000—$12,000 in food. Fridley asserts that subsequent to entering the purchase agreement he examined the past records of the Esquire Club which showed that the gross receipts were less than those amounts. Thereafter, Fridley notified Porter of his intent to rescind the purchase agreement on the ground that he had been fraudulently induced to purchase the Esquire Club.

■ With regard to this issue, the trial court made the following relevant findings of fact:

"Fridley operated the Esquire Club for four months, from December 5, 1983 through March 30, 1984, when he voluntarily closed it down.... During the time he operated the Esquire Club he prepared no profit and loss statements, no summaries of accounts receivable or accounts payable. He does not know how much the gross receipts were during the four months. He does not know what the gross expenses were during the four months.

* * * * * *

"There was no evidence offered indicating that D.G. Porter, Inc., or any of its officers or agents, made any representations as to net income after all expenses were paid. There was no clear and convincing evidence offered that

D.G. Porter, Inc., or any of its officers or agents, made any misrepresentations of gross receipts.

"Fridley alleges in his notice of rescission that past gross receipts were misrepresented to him as running between $60,000.00 to $70,000.00 per month. Porter told Fridley in September, 1983, that the gross receipts for 1981 were about $800,000.00 ($66,000.00 per month), for 1982 were about $730,000.00 ($61,000.00 per month), and for 1983 were estimated to be about $650,000.00 (actual 1983 gross receipts were $55,000.00 per month through December 3rd). Thus, the actual gross receipts while D.G. Porter, Inc., operated the business were within the range Fridley claims was fraudulent. Additionally, before he signed the contract Fridley was warned by his attorney and by the Porters that business had declined.

* * * * * *

"It appears from the evidence as a whole that Fridley was not defrauded but rather that he decided he could not afford the contract he voluntarily entered into and that after two months of operating the business he decided it was too much of a burden."

There is substantial evidence in the record to support the foregoing findings of fact by the trial court, and, therefore, we conclude that they are not clearly erroneous. Thus, the trial court's determination that Fridley failed to prove by clear and convincing evidence that Porter misrepresented the gross receipts of the Esquire Club or otherwise fraudulently induced Fridley to purchase that business is not clearly erroneous.

Fridley asserts that the trial court erred in its determination that the purchase agreement was not void for untimely transfer of the liquor license. Relevant to this issue, the purchase agreement included the following provision:

"It is further understood and agreed that this sale is conditioned upon the transfer to Purchaser of the retail on and off-sale

liquor license now held by Seller as issued by the City of Dickinson and State of North Dakota. Purchaser shall be responsible to secure such transfer as may be required but Seller covenants to diligently assist Purchaser in securing said transfer. Should Purchaser be unable to secure such transfer of liquor licenses within sixty (60) days from the date hereof, this agreement for purchase of the said business shall be null and void and each party shall promptly return to the other, all monies paid to it and property received by it, together with any other instruments or security agreements received."

It is undisputed that the retail liquor license was actually transferred to Fridley on February 6, 1984, which was 63 days after the purchase agreement had been executed. On the transfer date, Fridley and his attorney appeared before the city commission and accepted the transfer of the liquor license, without objection, and thereafter Fridley continued to operate the Esquire Club until he vacated it on April 1, 1984.

■ The trial court determined that Fridley, by accepting the liquor license transfer and continuing to operate the Esquire Club, waived the right to object to the timeliness of the transfer. We believe that determination by the trial court was correct. Fridley, having accepted the transfer without objection on the 63rd day and having continued to operate the business, cannot thereafter object to the untimeliness of the transfer. By his voluntary actions, he waived the right to object.

Fridley asserts that the trial court applied an incorrect remedy. We agree.

Upon concluding that Fridley had failed to prove that he had been fraudulently induced to purchase the Esquire Club, the trial court determined that Fridley's notice of rescission and consequent failure to make the $50,000.00 down payment as required under the purchase agreement constituted an anticipatory breach of the entire agreement. Based upon that determination, the trial court entered a judgment

awarding Porter the contract price of $250,000 plus interest and costs. The trial court also declared in its judgment that Porter possessed a security interest in the Esquire Club entitling Porter to sell the business and to apply the proceeds, less reasonable expenses of resale, to Fridley's debt.

To determine the appropriate remedy in this case, it is necessary to first determine whether the Uniform Commercial Code provisions of Chapter 41-09, N.D.C.C., Secured Transactions, or Chapter 41-02, N.D.C.C., Sales, are applicable. For reasons hereafter stated in this opinion, we determine that those provisions are not applicable.

■ Porter asserts that the purchase agreement created a security interest for Porter in the Esquire Club and that, as a consequence, the secured transactions provisions of Chapter 41-09, N.D.C.C., are applicable in determining the remedy available to Porter for Fridley's breach. We disagree that the purchase agreement created a security interest in Porter.

The only reference in the purchase agreement to a security interest is contained in paragraph 12 of the agreement:

"12. *Security for Payment of Balance of Purchase Price.* Purchaser shall execute at the final closing, a promissory note evidencing the balance of purchase price due to Seller payable in installments as above indicated, and with interest on deferred balances at the rate of ten percent (10%) per annum, such note to be in a form satisfactory to the attorney for Seller, and containing an acceleration clause in the event of default in the making of the installments as the same becomes due. As collateral security for the payment of the promissory note, Purchaser shall execute and deliver to Seller, at the final closing, a security agreement granting Seller a security interest in all of the assets being sold, or their replacement, which security agreement shall contain an after acquired property clause and such other

provisions as the attorney for the Seller may request. Security agreement and accompanying documents shall be in such form as shall meet the requirements of the Uniform Commercial Code as applicable to commercial transactions in the State of North Dakota."

A security agreement is defined under Section 41–09–05(1)(*l*), N.D.C.C., as an agreement which "creates or provides for a security interest." Although the provisions of the U.C.C., codified as Chapter 41–09, N.D.C.C., require no magic words or precise form to evidence a security agreement, we conclude that paragraph 12 of the purchase agreement does not create or provide for a security interest but merely evidences an intent by the parties to create a security interest in the future on the date of the final closing. Because the closing never occurred, the anticipated promissory note and security agreement were never executed.

In that important respect, this case must be distinguished from *Elhard v. Prairie Distributors, Inc.*, 366 N.W.2d 465 (N.D. 1985), in which this Court found that a security interest had been created in favor of the seller. In *Elhard, supra,* an appliance distributor, Northwestern Sales, Inc. [Northwestern], entered a series of transactions to transfer its business, inventory, and other assets to Prairie Distributors, Inc. [Prairie]. In one such transaction Northwestern leased its business assets to Prairie with an option to purchase, and that lease agreement provided that if the option were exercised Prairie "will execute a promissory note" and "will execute an appropriate security agreement." However, on that same date Northwestern and Prairie executed a bill of sale and agreement which provided in relevant part:

"*Northwestern hereby retains a security interest* in the inventory conveyed hereunder and all assets, inventory and all after acquired inventory, accounts receivable, and proceeds of Prairie's business to secure payment by Prairie of the balance of the sum required under the terms of this agreement." [Emphasis added.]

This Court concluded that the foregoing language created a security interest in Northwestern.

The purchase agreement in this case, unlike the bill of sale and agreement executed in *Elhard, supra,* contains no language which can be construed as providing for or creating a current security interest. The language found within paragraph 12 of the purchase agreement merely evidences an intent by the parties that a promissory note and appropriate security agreement would be executed in the future on the date of closing. Neither a closing nor an execution of those documents ever occurred. Consequently, Porter does not have a security interest, and the secured transactions provisions of Chapter 41–09, N.D.C.C., are therefore inapplicable to this litigation.

■ To determine the appropriate remedy in this case, it is also necessary to first determine whether the U.C.C. sales provisions of Chapter 41–02, N.D.C.C., are applicable to this litigation. We conclude that they are not. The scope of that chapter is provided under Section 41–02–02, N.D.C.C., which states that the chapter "applies to transactions in goods." Relevant to this case, "goods" are defined under Section 41–02–05, N.D.C.C., as "all things ... which are movable at the time of identification to the contract for sale...."

We believe that the appropriate test for determining whether the sales provisions of the U.C.C. are applicable to a particular sale of an ongoing business was set forth in *De Filippo v. Ford Motor Company,* 516 F.2d 1313 (3rd Cir.), *cert. denied,* 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 141 (1975):

"Rather than a view of mechanical technicality or of mathematical nicety, a view of the reasonable totality of the circumstances should control the characterization of the contract for sale. If, viewed as a whole, it can be concluded that the essential bulk of the assets to be transferred qualify as 'goods', then it is appropriate to consider the transaction a

'contract for the sale of goods'." 516 F.2d at 1323.

See also, *Field v. Golden Triangle Broadcasting, Inc.*, 451 Pa. 410, 305 A.2d 689 (1973), *cert. denied*, 414 U.S. 1158, 94 S.Ct. 916, 39 L.Ed.2d 110 (1974). In applying the foregoing test, the *De Filippo, supra,* court determined that the transfer of an automobile dealership was essentially a transfer of goods to which the sales provisions of the U.C.C. applied:

> "Applying this rule to the facts before us and carefully examining the list of assets to be sold, we note that title to no real estate was to pass in the transaction, nor was any value assigned for good will or the value of the business as a going concern. Accordingly, we have no hesitation in agreeing with the district court's applying U.C.C. § 2–201...." 516 F.2d at 1323.

A similar rule was adopted by this Court in *Air Heaters Inc. v. Johnson Electric, Inc.*, 258 N.W.2d 649 (N.D.1977), for determining the applicability of the U.C.C. to a non-divisible contract for goods and services:

> "[I]t becomes necessary in mixed goods and service contracts, to determine whether their predominant factor, their thrust, their purpose reasonably stated is the rendition of service, with goods incidentally involved, or is a transaction of sale, with labor incidentally involved." 258 N.W.2d at 652.

Under that test, if the predominant factor or thrust of the contract is the sale of goods and the rendition of services is only incidentally involved the contract is for a sale of goods and the U.C.C. sales provisions are applicable. *Robertson Companies, Inc. v. Kenner,* 311 N.W.2d 194 (N.D. 1981).

In this case, the purchase agreement for the sale of the Esquire Club involved the transfer of furniture, equipment, and inventory which fall within the categorization of movable goods identifiable to the contract. However, the sale contemplated the following actions which together, we believe, constituted the essential elements of the sale and are the elements upon which this litigation focuses: the sale of "goodwill", the transfer of Porter's retail liquor license, the assignment of the lease of the business premises, the transfer of fixtures, and the transfer or assignment of insurance policies and other contracts related to the business.

Using the *De Filippo, supra,* test, we apply the U.C.C. sales provisions to the sale of an ongoing business only if the essential element or nature of the contract is for the transfer of movable goods, and the transfer of items other than movable goods, such as goodwill or realty, and the performance of other acts, such as the assignment of a lease or transfer of a license, are merely incidental or secondary elements under the contract. Applying that test in this case, we conclude that the essential nature or element of the purchase agreement involved items other than movable goods and, therefore, the U.C.C. sales provisions, Chapter 41–02, N.D.C.C., are not applicable.

Having determined that neither the secured transactions provisions nor the sales provisions of the Uniform Commercial Code are applicable to this case, we turn to other authorities to determine the appropriate remedy in this case.

■ The general rule is that the seller's remedy for the buyer's breach of an executory contract to purchase an ongoing business is to recover damages for the difference between the contract price and the fair market value of the business on the date of the breach. *Peery v. Hansen,* 120 Ariz. 266, 585 P.2d 574 (Ariz.Ct.App.1978); *Redmond v. Prosper, Inc.,* 364 So.2d 812 (Fla.Dist.Ct.App.1978); *Aboud v. Adams,* 84 N.M. 683, 507 P.2d 430 (1973); See also *Fateh v. Rich,* 481 A.2d 464 (D.C.App. 1984). However, in the case of an executed contract, where the seller has fully performed and the buyer has breached by refusing to pay the agreed-upon price, the seller may sue for the full contract price. *Fateh v. Rich, supra.* To determine which remedy is appropriate in this case, it is necessary to ascertain whether or not the

contract, at the time of Fridley's breach, was executory, with performance remaining to be completed by each party, or was an executed contract wherein Porter, as the seller, had fully performed with the price remaining to be paid by Fridley.

 Fridley breached the purchase agreement by notifying Porter that he was rescinding the agreement on the basis of fraudulent inducement to purchase. We conclude that on the date of that notice the agreement was executory. Although prior to the breach Fridley had taken physical possession of the premises and operated the business, neither Porter or Fridley had fully performed. For example, Porter, as seller, covenanted to provide Fridley with a "bill of sale and instruments of assignment to be delivered at the closing." Porter also contracted to pay all social security, withholding, sales and unemployment taxes "up to the date of closing" and covenanted that "no judgments or liens will be outstanding at the time of the closing." The purchase agreement also provided that appropriate adjustments to the total purchase price would be made at the date of closing with regard to insurance premiums, rent, payroll and payroll taxes. The sale of the business expressly included a transfer of "insurance policies" and "all contracts which may have been entered into by seller in connection with such business," and those instruments, which were to be transferred at the time of the closing, had not been transferred as of the date of Fridley's breach. Fridley, as purchaser, agreed to execute, on the date of closing, a promissory note evidencing the balance to be paid in installments and a security agreement providing Porter with a security interest in the assets to be transferred on that day. Because the closing never occurred, none of the foregoing promises were performed. Thus, the contract, on the date of Fridley's breach, was an executory contract. Accordingly, when Fridley breached the contract prior to the contemplated closing date, Porter was required under the circumstances to act reasonably in assuming control of the business in order to mitigate his damages. *Tomlinson Lumber Yard v. Engel,* 216

N.W.2d 87 (N.D.1974). His remedy was not an action for the price, but rather an action for damages for the difference between the contract price and the fair market value of the business at the time of Fridley's breach.

This remedy is consistent with the measure of damages authorized by Section 32–03–09, N.D.C.C.:

"*32–03–09. Measure of damages for breach of contract—Damages must be certain.*— For the breach of an obligation arising from contract, the measure of damages, except when otherwise expressly provided by the laws of this state, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby or which in the ordinary course of things would be likely to result therefrom...."

Porter has not demonstrated, nor has the trial court found, that such a remedy would fail to fully and fairly compensate Porter for Fridley's breach. By this remedy, Porter will receive the equivalent of what he bargained for under the agreement: in addition to retaining the business he will receive an amount equal to the difference between the contract price of $250,000 and the value of the business on the date of Fridley's breach.

The trial court has made no determination of the Esquire Club's fair market value on the date of breach. It is necessary for the trial court to do so on remand.

Prior to Fridley's breach, the lease of the premises had been assigned and the retail liquor license transferred to him. Porter states in his brief on appeal that following Fridley's abandonment of the premises, Porter contracted with a third party for the resale of the Esquire Club. Among others, the foregoing matters are factors which the trial court may take into account in determining the fair market value of the business on the date of the breach.

In accordance with this opinion, the order denying Fridley's motion to disqualify Porter's counsel is affirmed, the judgment is reversed, and the case is remanded for

further proceedings to redetermine the damages to be awarded to Porter.

VANDE WALLE and LEVINE, JJ., and PEDERSON, Surrogate Judge, concur.

PEDERSON, Surrogate Judge, sitting in place of GIERKE, J., disqualified.

MESCHKE, Justice, concurring in part and dissenting in part.

I concur fully in Chief Justice Erickstad's opinion except the analyses of remedy issues. I respectfully dissent as to the reversal and remand for redetermination of damages.

Upon breach of a truly executory contract, the correct measure of damages is the difference between the contract price and the fair market value of the business on the date of the breach, plus any incidental damages. That would be true under the Uniform Commercial Code for goods. (N.D.C.C. § 41–02–87, (U.C.C. 2–708)). It would also be true under basic contract law for sale of any personal property. 11 S. Williston, *A Treatise of the Law of Contracts* § 1351 (3d ed. 1968); 5 A. Corbin, *Corbin on Contracts*, § 1053 (1964). *Restatement (Second) of Contracts*, §§ 347, 350 (1981).

The Uniform Commercial Code on sales is a well-reasoned formulation of contract law as it is applicable to goods. The Uniform Commercial Code should be regarded "less as a novel enactment than as largely a restatement and clarification of existing law which has the approval of American scholars;" *Universal C.I.T. Credit Corp. v. Guaranty Bank and Trust Co.*, 161 F.Supp. 790 (D.Mass.1958). Rather than mechanically distinguishing it, we should look first to its expression of commercial law for guidance. While a distinction between sale of goods subject to the Uniform Commercial Code and sale of other assets may sometimes be necessary or desirable, it should be based upon good reason after analysis, and not serve as the starting point.

Since the remedy is the same, I see no need to make the "essential nature" analy-

sis of this sales contract. We should not complicate commercial law by differentiating where no difference exists. Therefore, I respectfully disagree with the "essential nature" analysis.

The real remedy issue in this case is whether this is a repudiation of an executory contract or of a contract where the seller has fully performed so as to be entitled to the price. If a promisee has fully performed, he is "entitled to the full value of the defendant's performance." 11 S. Williston, *A Treatise on the Law of Contracts*, § 1349 (3d ed. 1968); 5 A. Corbin, *Corbin on Contracts*, § 1100 (1964); N.D. C.C. § 41–02–88(1) (U.C.C. 2–709). This rule has been essentially recognized in North Dakota in *Bryan v. Northwest Beverages*, 69 N.D. 274, 285 N.W. 689, 692 (1939) which stated: "... [H]e may bring an action on the contract for the breach thereof, and recover the contract price, less the necessary expense of completing the same." Where a seller has fully performed, there is no "necessary expense of completing the same."

The opinion of the Chief Justice analyzes this as an executory contract and therefore holds the trial court erred in awarding the price remedy. But, Porter had delivered full possession and caused transfer of the important liquor license. The delivery of closing documents and closing adjustments by the seller is simply formal, not substantial. Therefore, I respectfully dissent as to the analysis and holding on the remedy. Since the seller had substantially completed his performance, I believe the trial court correctly applied the price remedy.

I am also troubled by the "security interest" analysis of the Chief Justice's opinion. The lack of a "security interest" did not appear to be an issue below since it was not identified as one in Fridley's answer. The issue was certainly not well briefed on this appeal, as it was only passingly mentioned by Fridley that the "security agreement was never executed" by him.

Since Porter repossessed, it is difficult to see why it matters whether he did it pursu-

ant to a security agreement or simply as an unpaid seller protecting his interests when the defaulting buyer abandoned the business. Either way, it was essentially consensual and the result should be the same. (*See also* N.D.C.C. § 41–02–46(4) (U.C.C. 2–401): "A rejection or other refusal by the buyer to ... retain the goods, whether or not justified, ... revests title to the goods in the seller. Such revesting occurs by operation of law and is not a 'sale'.") Whether foreclosed or repossessed, the defaulting buyer is entitled to credit or offset on the judgment for actual proceeds collected on the resale. *See Fateh v. Rich*, 481 A.2d 464 (D.C.1984) and N.D.C.C. § 41–02–88(2) (U.C.C. 2–709). And, if the contract is executory rather than executed as to the seller, it seems to me that the burden of proving remaining market value upon return should be on the defaulting buyer. (It should be noted that Porter resold the abandoned business, but only after trial.)

For these reasons, I would also avoid addressing the "security interest" issue.

But, if I were to decide the "security interest" issue, I would approach it differently. First, there do not appear to be any affected rights of intervening lien creditors or good faith purchasers which is the customary context in which the existence of a valid security interest is at issue. Second, the chapter on secured transactions says, " 'Security agreement' means an agreement which creates or *provides* for a security interest." (emphasis supplied) § 41–09–05(1)(*l*), N.D.C.C. (U.C.C. 9–105). *See also* § 41–09–02(1), N.D.C.C. (U.C.C. 9–102): "... this chapter applies to: a. Any transaction (regardless of its form) which is

intended to create a security interest in personal property...." It is clear that Fridley and Porter intended to "provide" for a security interest between themselves in paragraph 12 of the sales contract.

It is not at all clear that the use of the phrase, "at the final closing," evidenced an intent to postpone the effectiveness of the security interest in all events. The "closing" of the seller's performance was delayed for transfer of the liquor license (Paragraph 9). That had been completed before Fridley repudiated. In my opinion the contract should not be interpreted, as a matter of law, to wholly defer the security interest where the buyer goes into immediate possession. At least, the contract is ambiguous on this point.

The district court determined that Porter, "pursuant to the contract possesses a security interest in the Esquire Club" (Conclusion of Law 11). A finding of fact, wherever found, should not be set aside on appeal unless clearly erroneous. Rule 52(a), N.D.R.Civ.P. I am not firmly convinced that the trial court was mistaken in so finding.

I also respectfully submit that the "security interest" issue should not be decided on this appeal, or, if it is, should be affirmed.

I would affirm the judgment in all respects.