**In re STATE STREET AUTO SALES, INC., Debtor.**

**MULTIBANK NATIONAL OF WESTERN MASSACHUSETTS, N.A., Plaintiff,**

v.

**STATE STREET AUTO SALES, INC.; Frank Cuzzone; Webe Auto Sales, Inc.; Agawam Motor Company; Rosemary Galari; Car Barn, Inc.; and John Doe, Being Divers Parties Who Have Consigned Vehicles to the Debtor, Defendants.**

Bankruptcy No. 87–40076JFQ.
Adv. No. 87–4021.

United States Bankruptcy Court,
D. Massachusetts.

Jan. 13, 1988.

Steven Weiss, Cooley, Shrair, Alpert, Labovitz & Dambrov, Springfield, Mass., for MultiBank Nat. of Western Massachusetts, N.A./plaintiff.

Peter Stern, Springfield, Mass., for debtor/defendant Frank Cuzzone.

Jane Crosby, Santaniello, Posnik, Basile & Rideout, Springfield, Mass., for Car Barn/defendant.

## MEMORANDUM

JAMES F. QUEENAN, Jr.,
Bankruptcy Judge.

A bank holding a security interest in the inventory of a car dealer seeks to extend its security to vehicles which have been consigned by their owners to the dealer for sale. Presented is a question of statutory construction involving considerable tension between Articles 2 and 9 of the Uniform Commercial Code. After a trial and submission of memoranda of law by the parties, the Court today issues a separate judgment permitting the plaintiff's security interest to extend to the consigned vehicles. The following memorandum contains findings of fact and rulings of law in support of that judgment.

### FINDINGS OF FACT

State Street Auto Sales, Inc. (the "Debtor") is in the business of buying and selling used cars. Multibank National of Western Massachusetts, N.A. (the "Bank"), the plaintiff, is the inventory secured lender to the Debtor. The primary defendant here, Car Barn, Inc. ("Car Barn"), is the owner of certain consigned vehicles in the possession of the Debtor. The other defendants are owners of consigned vehicles whose rights have been adjudicated through default judgments.

The Debtor has sold used cars at the retail level for over 40 years. Its relationship with the Bank and the Bank's predecessor extends over that time period. The Bank has lent to the Debtor on the basis of a "floor plan" arrangement under a line of

credit based upon the Debtor's current needs to purchase specific inventory. The Bank would record and monitor the financed vehicles to be sure that a portion of the proceeds from each sale were applied to reduce the secured debt. The Bank has perfected its interest in the cars on the floor plan by filing a financing statement with a "floating lien" covering present and future inventory, and its proceeds.

In order to ensure that all cars on the floor plan and their proceeds were accounted for, the Bank made monthly inspections of the Debtor's inventory. The Debtor often had on hand a few vehicles delivered to it for sale or return by owners such as Car Barn. These normally amounted to only about 20% of the Debtor's total inventory. The Bank asserts that its inspection of the Debtor's inventory did not extend beyond the cars on the floor plan, and that it had no knowledge of vehicles not included in the floor plan. That may be true of the Bank's home office personnel, but it is unlikely that the Bank's agents making the monthly inspections would not know of the Debtor's consignment transactions. The Court finds that the Bank at all times knew that the Debtor sold cars on consignment and that the cars on the Debtor's lot usually included some consigned vehicles. The Bank's security agreement with the Debtor as well as an amended financing statement filed in 1984 reflect this knowledge. Both documents attempt to draw consigned vehicles into the Bank's perfected security interest. The Bank was also aware of repossessed vehicles which it had itself consigned to the Debtor for sale.

Car Barn has had an informal consignment arrangement with the Debtor for over fifteen years. It delivered two cars to the Debtor on January 20, 1987. One vehicle is a 1981 Cadillac Eldorado, which was sold subsequent to the commencement of this Chapter 11 case for $13,000 (now held in escrow). The second vehicle is a 1985 Cadillac Eldorado, which has not been sold. At the time of delivery, Car Barn retained title to both vehicles. If the Debtor sold a vehicle consigned by Car Barn, it would in the past remit the proceeds to Car Barn after deducting a commission as selling agent. Car Barn never filed a financing statement giving notice of its interest in the vehicles, nor did it ever notify the Bank that it had consigned vehicles to the Debtor. The Bank knew, however, that the two vehicles in question were held by the Debtor on consignment from some unknown owner.

On February 12, 1987, the Bank repossessed the Debtor's inventory. At the time of repossession, the Bank's agents were told that several cars on the Debtor's lot were consigned vehicles. The Bank did not take custody of those vehicles at that time. The Debtor filed a petition under Chapter 11 of Title 11 of the United States Code (11 U.S.C. § 1101 *et seq*) on the same day.

## DISCUSSION

### A. *Consignments Under The U.C.C. Generally*

The Uniform Commercial Code's provisions regarding consignments are not models of draftsmanship. At first glance, Article 2 seems to govern consignments completely. Under Mass.Gen.L. ch. 106, § 2–326 [1], where goods are delivered to a

---

1.  § 2–326. Sale on Approval and Sale or Return; Consignment Sales and Rights of Creditors

    (1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is

    (a) a "sale on approval" if the goods are delivered primarily for use; and

    (b) a "sale or return" if the goods are delivered primarily for resale.

    (2) Except as provided in subsection (3), goods held on approval are not subject to the claims of the buyer's creditors until accept-

ance; goods held on sale or return are subject to such claims while in the buyer's possession.

    (3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consign-

dealer who normally sells such goods with the understanding that the dealer can return the goods even though there is nothing wrong with them, the transaction is deemed one of "sale or return" despite a purported reservation of title and despite use of words such as "on consignment" or "on memorandum." The goods are made "subject to the claims" of the dealer's "creditors" unless the consignor does one of three things: (1) complies with a so-called "sign law"; (2) establishes that the dealer is "generally known by his creditors to be substantially engaged in selling the goods of others"; or (3) files under Article 9.

After general passage of the Code, uncertainty arose concerning whether, in order to take advantage of the filing option in § 2–326, the consignor also had to give notice to any holder of a security interest in the dealer's inventory under § 9–312(3). In order to clarify the matter, the 1972 Revision inserted U.C.C. § 9–114.[2] This new section requires the filing consignor also to give written notification to the secured creditor of his interest in the goods before the goods are delivered to the consignee. In this respect, the section parallels the filing requirements governing purchase money secured lenders under § 9–312. *See* Mass.Gen.L. ch. 106, § 9–312(3). Section 9–114, however, goes further than its professed purpose. It provides that any consignor who does not comply with the filing provisions of § 9–114 has an interest junior to that of the secured creditor. Mass.Gen.L. ch. 106, § 9–114(2). It thus appears to take priority rights in all consignments largely out of Article 2 and place them into Article 9, the scope provision of which would seem to exclude consignments not intended to create security interests. *Compare* Mass.Gen.L. ch. 106, § 9–114(2) *with* Mass.Gen.L. ch. 106, § 9–102(1)(a). In so doing, § 9–114 seems to vitiate much of § 2–326 by removing the other ways for the consignor to protect himself. Furthermore, it grants exclusive rights in the goods to the secured creditor, which is quite different from the provision in § 2–326 which makes the consigned goods subject to the claims of the consignee's "creditors."

Fortunately, most courts and commentators, in the spirit of U.C.C. § 1–104's mandate against implicit repeal of provisions by subsequent legislation, have interpreted

---

ment" or "on memorandum". However, this subsection is not applicable if the person making delivery

(a) complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign; or

(b) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others; or

(c) complies with the filing provisions of the Article on Secured Transactions (Article 9);

(4) Any "or return" item of a contract for sale is to be treated as a separate contract for sale within the statute of frauds section of this Article (section 2–201) and as contradicting the sale aspect of the contract within the provisions of the Article on parol or extrinsic evidence (section 2–202).

**2. § 9–114. Consignment**

(1) A person who delivers goods under a consignment which is not a security interest and who would be required to file under this Article by subsection (3)(c) of section 2–326 has priority over a secured party who is or becomes a creditor of the consignee and who would have a perfected security interest in the goods if they were the property of the consignee, and also has priority with respect to identifiable cash proceeds received on or before delivery of the goods to a buyer, if

(a) the consignor complies with the filing provisions of the Article on Sales with respect to consignments in said subsection (3)(c) of said section 2–326 before the consignee receives possession of the goods; and

(b) the consignor gives notification in writing to the holder of the security interest if the holder has filed a financing statement covering the same types of goods before the date of the filing made by the consignor; and

(c) the holder of the security interest receives the notification within five years before the consignee receives possession of the goods; and

(d) the notification states that the consignor expects to deliver goods on consignment to the consignee, describing the goods by item or type.

(2) In the case of a consignment which is not a security interest in which the requirements of the preceding subsection have not been met, a person who delivers goods to another is subordinate to a person who would have a perfected security interest in the goods if they were the property of the debtor.

§ 9–114 to be limited to those instances where the other exceptions in § 2–326 do not apply. *See BFC Chemicals, Inc. v. Smith–Douglass, Inc.,* 46 B.R. 1009, 1019–20 (E.D.N.C.1985); *The Escrow Connection v. Haas,* 189 Cal.App.3d 1640, 235 Cal.Rptr. 200, 3 U.C.C.Rep.Serv.2d (Callaghan) 547 (1987); *Logan Paving Co. v. Massey–Ferguson Credit Corp.,* 172 Ga. App. 368, 323 S.E.2d 259, 40 U.C.C.Rep. Serv. (Callaghan) 116 (1984). *See also* 1B Coogan, Hogan, Vagts & McDonnell, *Secured Transactions Under The Uniform Commercial Code* § 18.03[7][b] (1987) (only sensible construction is to restrict § 9–114 to those cases where filing is the only effective means for a consignor to prevail under § 2–326(3)). We agree that achieving this harmony is the proper way to resolve the conflict.

Car Barn has not met its burden of establishing that any of the exceptions under § 2–326(3) apply. There is no sign law in Massachusetts. The Debtor was not substantially engaged in the business of selling consigned vehicles, much less "generally known" by its creditors to be doing so. The Bank, which is the Debtor's largest creditor, knew of the Debtor's consignment business, and knew that the two cars in question here were consigned by unknown parties. Section 2–326(3)(b), however, speaks of "creditors," which implies that a majority of creditors in number must have knowledge, not a majority of creditors by amount of claims. *Quaker City Iron Works, Inc. v. Ganz (In re Wicaco Machine Corp.),* 49 B.R. 340, 343–44 (E.D.Pa. 1984). Even if the Bank's knowledge alone was enough to satisfy the "generally known" test, the Debtor sold only a few cars on consignment each year. The comments to § 2–326 state that the consignee must be "primarily" engaged in selling the goods of others in order for the consignor to take advantage of the § 2–326(3)(b) exception. Mass.Gen.L. ch. 106, § 2–326 com-

ment 2. Finally, Car Barn has neither filed a financing statement nor has it given the written notice to the Bank as required by § 9–114.[3] The Bank therefore appears to have superior rights under §§ 2–326 and 9–114.

### B. *Effect of Bank's Knowledge*

Where, however, a secured creditor with actual knowledge of consignments seeks rights in the consigned goods, some courts have created a means for the consignor to prevail based in part on the goals of § 2–326 and in part on equitable estoppel. *See GBS Meat Industry Pty. Ltd. v. Kress–Dobkin Co.,* 474 F.Supp. 1357 (W.D. Pa.1979); *First National Bank of Blooming Prairie v. Olsen,* 403 N.W.2d 661, 3 U.C.C.Rep.Serv.2d (Callaghan) 554 (Minn. App.1987). These courts' rationale starts with the comments to § 2–326. Comment 2 states that § 2–326 endeavors to protect creditors of the consignee who "may reasonably be deemed to have been misled by the secret reservation [of title in the consignor]." Mass.Gen.L. ch. 106, § 2–326 comment 2. At common law, consignors often prevailed over creditors who had extended credit to a consignee based on the consignee's apparent ownership of consigned goods. Consignors prevailed because they still held title in the goods; a consignee's creditors were therefore viewed as unable to take any interest through the consignee. *See* 1B Coogan, Hogan, Vagts & McDonnell, *Secured Transactions Under The Uniform Commercial Code* § 18.02[2] (1987). Section 2–326 attempts to alleviate this problem by giving creditors protection similar to that given bona fide purchasers from agents. *Cf.* Mass.Gen.L. ch. 106, § 2–403(2); *see id,* § 2–326 Massachusetts annotation 3. Section 2–326 also allows consignors to protect their interest either by providing actual or constructive notice to creditors that the

---

**3.** The fact that the Bank specifically listed consigned goods as collateral in its security agreement and financing statement has no impact on Car Barn's rights under § 9–114. The only right obtained by the Debtor in the consigned vehicles was to receive a percentage of the proceeds as a sales commission. No rights in the

property itself accrued to the Debtor. *See* Mass. Gen.L. ch. 106, § 9–203(1)(c). Furthermore, § 9–114 operates as a super-priority provision in the same way as § 9–312(3), which allows a purchase money security interest to take priority over a general inventory security interest. *See* Mass.Gen.L. ch. 106, § 9–312(3).

consignee deals in consigned goods, through compliance with sign laws or through filing. *See* § 2–326(3)(a), (b) & (c). Where a secured creditor has knowledge of consignments, he will certainly not advance funds to the consignee based on the consignee's possession of the consigned property. *See GBS Meat Industry Pty. Ltd.*, 474 F.Supp. at 1362–63.

Courts adopting this rationale conclude that the circumstances which § 2–326 seeks to address are not present when a secured party has actual knowledge of consignments. Because the secured party seeks to obtain goods which it knows never belonged to the consignee, the courts estop the secured party from relying on the U.C.C. provisions to enforce its claim and thus receive a windfall. *See GBS Meat Industry Pty. Ltd., supra; First National Bank of Blooming Prairie*, 403 N.W.2d at 665, 3 U.C.C.Rep.Serv.2d at 559–61 (disclaiming reliance on estoppel principles, but in effect relying on such principles). *See also Newhall v. Haines*, 10 B.R. 1019, 1023 n. 5 (D.Mont.1981) (if the court awarded consigned property to a secured creditor who with knowledge of the consignment repossessed the property, it "would subvert the intent of [§ 2–326] and sanction intentional conversion").

The Court agrees that equitable considerations may justify denying a secured creditor rights under § 2–326 and § 9–114. Mass.Gen.L. ch. 106, § 1–103 states: "Unless displaced by the particular provisions of [the U.C.C.], the principles of law and equity, including … estoppel, … or other validating or invalidating cause shall supplement its provisions." The drafters of the U.C.C. obviously contemplated that equitable principles may create exceptions to U.C.C. provisions. Courts therefore should consider the equities of a case unless equitable principles have been displaced by an express U.C.C. provision limiting a party's remedy. *Morgan Guaranty Trust Co. v. American Savings & Loan Ass'n*, 804 F.2d 1487, 1495 (9th Cir.1986). In doing so, however, we must be sensitive to the public policy goals expressed in the statutes and keep in mind the First Circuit's admonishment that: "Efforts by courts to fashion equitable solutions to mitigate the hardship on particular creditors from literal application of statutory filing requirements could have the deleterious effect of undermining the reliance which can be placed upon them. The harm would be more serious than the occasional harshness resulting from strict enforcement." *Uniroyal, Inc. v. Universal Tire & Auto Supply, Co.*, 557 F.2d 22, 23 (1st Cir.1977).

This caution is particularly relevant here. Those courts which have denied a secured creditor rights under § 2–326 and § 9–114 because of the creditor's knowledge have placed too much emphasis on the goals of § 2–326 and ignored the goals of § 9–114. Although a clear purpose of § 2–326 is to ensure that creditors will be protected against the inherent secret title in consigned property, § 9–114 spells out the means by which a consignor must notify an inventory secured creditor of his title to specific property. The location of this section within Article 9 is significant. Article 9 extensively addresses the effect of actual and constructive knowledge of the interests of others in property, and establishes the priority of those interests as the result of such knowledge. Actual knowledge is at times quite relevant. *See e.g.*, Mass.Gen.L. ch. 106, §§ 9–301(1)(c), (d) & (4); 9–312(3). In other cases, only constructive notice controls priority. Mass.Gen.L. ch. 106, §§ 9–301(1)(a) & (b), (2); § 9–312(1), (2), (4), (5) & (7). Actual knowledge normally plays only a minor role in Article 9, as pointed out in the comment of Permanent Editorial Board concerning the 1972 amendment to § 9–301(1)(b), an amendment which deleted the requirement that a lien creditor acquire his lien without knowledge of an unperfected security interest in order to have priority over that interest. *See* Mass.Gen.L. ch. 106, § 9–301 official reasons for 1972 change.

Where notice is required for the purpose of giving actual rather than constructive knowledge, the prescribed notice is of more importance than the knowledge itself. Mass.Gen.L. ch. 106, § 9–312(3) is particularly relevant on this point because § 9–114 mirrors its provisions. Although the situa-

tions addressed by the two statutes are different, they both reflect a perceived need for a party claiming an interest superior in inventory to give a pre-existing secured party both constructive notice and actual notice in writing. One may question the need for such protection in a consignment situation; however, the policy choice of § 9–114 must be respected. In cases applying § 9–312(3), courts strictly require purchase money security interest holders to take action to give actual notice. *See Manufacturers Acceptance Corp. v. Penning's Sales, Inc.,* 5 Wash.App. 501, 487 P.2d 1053, 9 U.C.C.Rep.Serv. (Callaghan) 797 (1971). The notice given must be written; any other kind is insufficient. *Elhard v. Prairie Distributors, Inc.,* 366 N.W.2d 465, 40 U.C.C.Rep.Serv. (Callaghan) 1868 (N.D.1985).

Although courts have been open to estoppel arguments, the specific notice requirements in Article 9 usually undermine any such argument unless the facts strongly support a finding of inequitable behavior. *See Bostwick-Braun Co. v. Owens,* 634 F.Supp. 839 (E.D.Wis.1986) (junior secured party prevails where he had properly filed and perfected its interest with actual knowledge of a senior secured party's interest before the senior party's interest accidentially lapsed, despite apparent windfall to junior party); *Manufacturers Acceptance Corp. v. Penning's Sales, Inc., supra.* Because § 9–114 is located in Article 9, and because its provisions would appear to reflect a similar policy choice as the provisions of § 9–312(3), a similar rule should apply. *Cf. Gerber Industries v. Bildisco (In re Bildisco),* 11 B.R. 1019, 1022–23 (D.N.J.1981) (explaining need for protection of secured parties in purchase money security interest and consignment situations).

Section 9–114 is in a sense the child of § 2–326. Knowledge by the general creditor body of a dealer's consignment transactions if of course relevant under § 2–326 in preserving the consignor's rights. But even under that statute, the knowledge must be of a fact not present here: that the dealer is "substantially" engaged in selling the goods of others. In any event, it would be a clear distortion of this statutory scheme for the court to write a knowledge restriction into § 9–114 merely because of its relationship with § 2–326. The decision of the draftsmen to create rights for the secured creditor under Article 9 rather than Article 2 must be accorded its logical consequence.

Car Barn, moreover, is a merchant familiar with commercial practices. Section 9–114 has been part of the Massachusetts Uniform Commercial Code since 1979. Car Barn had every opportunity to protect its interests through filing under § 9–114, and it did not do so. The Bank, on the other hand, took all necessary steps to protect its rights. It even took the unnecessary step of including consigned goods in its security interest and filing notice of such an interest, which would have provided notice to a prudent consignor. The Bank discovered consigned vehicles on the Debtor's lot in the course of reasonable and prudent inspections of the Debtor's inventory. We infer knowledge primarily because of the Bank's regular inspection of its collateral. A holding that the Bank is·equitably estopped from asserting its rights because of its knowledge would punish the Bank for doing what the U.C.C. encourages: prudent protection of its security interest. There is no evidence of "sharp" practices or bad faith on the part of the Bank. The Bank was entitled to rely on its rights under § 9–114 to receive both actual and constructive notice.

## CONCLUSION

The Bank is entitled to priority over Car Barn under Mass.Gen.L. ch. 106, §§ 2–326 & 9–114 with regard to the consigned vehicles. A separate judgment shall issue.