GBS MEAT INDUSTRY PTY. LIMITED, an Australian Corporation, Plaintiff,

v.

KRESS–DOBKIN CO., INC., a Pennsylvania Corporation, K & D Meat Co., Inc., a Pennsylvania Corporation, David Dobkin, Individual, A. J. Armstrong Co., Inc., a New York Corporation, Defendants.

MOREE MEAT INDUSTRIES PTY. LIMITED, an Australian Corporation, Plaintiff,

v.

KRESS–DOBKIN CO., INC., a Pennsylvania Corporation, K & D Meat Co., Inc., a Pennsylvania Corporation, David Dobkin, Individual, A. J. Armstrong Co., Inc., a New York Corporation, Defendants.

Civ. A. Nos. 76–897, 76–896.

United States District Court, W. D. Pennsylvania.

Aug. 22, 1979.

Chester R. Babst, Pittsburgh, Pa., for plaintiff.

Stanley V. Ostrow, Pittsburgh, Pa., Morton Newman, Philadelphia, Pa., for A. J. Armstrong.

David R. Cashman, Pittsburgh, Pa., for Kress-Dobkin.

## OPINION

ZIEGLER, District Judge.

### I. *History of Case*

The instant case was submitted to the jury on special interrogatories. The jury found that defendants had converted the proceeds from the sale of five shipments of frozen beef and awarded damages to GBS Meat Industry Pty. Limited (GBS) in the sum of $28,464, and Moree Meat Industries

Pty. Limited (Moree Meat) in the sum of $125,781, with interest.

Presently before the court is the motion of A. J. Armstrong Co., Inc., (Armstrong) for judgment notwithstanding the verdict or, in the alternative, for a new trial pursuant to Rules 50(b) and 59 of the Federal Rules of Civil Procedure.[1] The motion must be denied for the following reasons: (1) the theory now advanced by Armstrong, namely, the district court erred in instructing the jury that Armstrong was liable for conversion if it had actual knowledge the meat was shipped to Kress-Dobkin on consignment, was not raised within the mandatory 10-day period prescribed by Rules 50 and 59; (2) Armstrong has waived the right to assert this theory because it failed to object to the court's instruction as required by Rule 51; (3) assuming Armstrong had preserved its objection, the instruction was a correct statement of the law; (4) there is sufficient evidence to sustain the jury's finding that Armstrong had actual knowledge of the consignment; and (5) the jury's verdict on the question of knowledge is not against the weight of the evidence.

### II. *Statement of Facts*

The following facts viewed in a light most favorable to plaintiffs were produced at trial.[2] Plaintiffs, GBS and Moree Meat, are Australian corporations. GBS is engaged in the business of providing merchandising services to meat packers. (T.139). Moree Meat is engaged in the wholesaling, retailing, and exporting of meat. (T.12). Plaintiffs owned and were in possession of five loads of frozen boneless beef. (GBS owned one and Moree Meat owned four.) Between January 17, 1974, and April 5, 1974, plaintiffs shipped the five loads of beef from Australia to Pennsylvania. While the goods were in transit, GBS and Moree Meat entered into oral consignment agreements with Kress-Dobkin, whereby Kress-Dobkin agreed to act as consignee of all five loads and to sell the beef in accordance with plaintiffs' instructions. In re-

---

1. Kress-Dobkin Co., Inc., K & D Meat Co., Inc., and David Dobkin have not filed post-trial motions.

2. The following summary will focus on the role of Armstrong in this transaction, since it is the only moving party.

turn, plaintiffs agreed to pay Kress-Dobkin a commission on the sales.[3]

Upon receipt of the consigned goods, Kress-Dobkin sold the meat in accordance with the instructions of plaintiffs. Thereafter, Kress-Dobkin and K & D, at the direction of Dobkin, assigned the receivables to Armstrong and converted the proceeds from the sales by remitting the invoice amounts to Armstrong.

A. J. Armstrong Co., Inc., is a financing company. Its International Division finances small and medium size enterprises throughout the United States, specifically those involved in either import or export operations. (T. 613). Armstrong began financing the predecessor of Kress-Dobkin in 1968. (T.198). On March 19, 1973, Kress-Dobkin executed a security agreement in favor of Armstrong. On May 24, 1973, K & D executed a similar agreement. (T.615). Armstrong filed financing statements pursuant to those agreements in accordance with the provisions of the Uniform Commercial Code. (T.619). In each instance, the collateral covered by the security agreements and financing statements included: "All now existing and hereafter acquired accounts, notes and other forms of obligations and all existing and hereinafter acquired inventory and all proceeds of all of the foregoing." (T.620).

The five shipments involved in this case were covered by the security agreements. Thus, when Kress-Dobkin sold the meat, it assigned the receivables to Armstrong. (T.497–513).

At trial, Armstrong contended, and the district court instructed the jury, that under Section 2–326 of the Uniform Commercial Code,[4] Armstrong was entitled to the proceeds from the sale of the beef unless Armstrong had actual knowledge that the goods were transferred to Kress-Dobkin on consignment. (T.420, 426, 708).[5]

The evidence concerning Armstrong's knowledge of the consignments between Kress-Dobkin and plaintiffs was circumstantial. Taken as a whole, however, we are satisfied that the jury could find, as it did, that Armstrong knew the goods were on consignment.

Armstrong financed all of Kress-Dobkin's international meat transactions. (T.288). The line of credit ranged from $1,200,000 to $1,600,000. Interest on these loans was 6 percent above prime or as much as 20 percent by late 1973. (T.653). Due to the size of the loads and the precarious nature of Kress-Dobkin's business, Armstrong was very interested in monitoring Kress-Dobkin's financial status. (T.667). Thus, in 1974, the year in which these transactions took place, officers of Armstrong, including Messrs. Hines and Galluzzo, contacted the Kress-Dobkin operation almost daily. (T. 202, 208, 209). Schedules of assignments of accounts receivables passed between Kress-Dobkin and Armstrong each day. (T.222). Employees of Armstrong performed periodic full scale audits of Kress-Dobkin's books and records, which often consumed several days. (T.210, 214). These inspections included examinations of Kress-Dobkin's accounts payable. (T.668). This is significant, since the monies owing on the five loads of meat involved in this case would have appeared on the accounts payable if Kress-Dobkin had purchased the meat from plaintiffs instead of taking them on consignment. (T.669, 670).

Armstrong's interest in Kress-Dobkin's financial situation intensified in the spring of

---

**3.** At trial, Kress-Dobkin contended that these oral agreements were outright sales on an offer and acceptance basis. The jury, in its answers to special interrogatories, found that the goods were transferred to Kress-Dobkin on consignment and there is ample evidence to support that finding.

Armstrong does not seriously contest this finding by the jury but, as will be explored later, asserts that it was entitled to the proceeds from the sale of the beef regardless of whether the goods were consigned or sold to Kress-Dobkin.

**4.** 12A P.S. § 2–326.

**5.** At trial, Armstrong agreed that this case involved a "true consignment" rather than a consignment intended as a security. As such, Armstrong agreed that the provisions of Article 9 of the Uniform Commercial Code were inapplicable and that § 2–326 was the governing section. (T. 283, 426). For a thorough discussion of the distinctions between true consignments and consignments intended as a security, see Annot., 40 A.L.R.3d 1078 (1971).

1974, the period in which the proceeds from the sale of the five loads of meat by Kress-Dobkin were remitted to Armstrong. Kress-Dobkin's financial position at the time was perilous. (T.210). By April 26, 1974, the company was insolvent. (T. 231). The debt to Armstrong totaled approximately 1.6 million dollars. (T.231). As a result, Armstrong reduced Kress-Dobkin's line of credit by 50 percent in May of 1974 and withdrew its line completely in June. (T.224, 225).

This pervasive control of Kress-Dobkin's operations, coupled with the serious financial status of K & D and Dobkin in the spring of 1974, supports the reasonable inference that Armstrong knew the goods were consigned to Kress-Dobkin. This inference is also supported by testimony that Armstrong paid the custom charges on the five loads of beef (T.665), and further that Moree Meat had previously consigned two loads of beef to Kress-Dobkin and received payment by Armstrong to Moree's account at an Australian bank. (T.237).

### III. *Discussion*

 Armstrong filed a timely motion for judgment notwithstanding the verdict, or a new trial contending, inter alia, there is insufficient evidence to sustain the jury's finding of knowledge or, in the motion for new trial, the weight of the evidence negated such a finding.[6] In its brief filed on June 28, 1979, over two months after the entry of judgment, Armstrong asserts for the first time that the district court erred in instructing the jury that Armstrong could be found liable for conversion if it knew that the meat shipped by plaintiffs was held by Kress-Dobkin on consignment. Armstrong contends that knowledge is irrelevant because it is entitled to the proceeds from the sales even with knowledge of the consignments.

Armstrong has failed to preserve any objection to this asserted error for two reasons. First, it was not raised in its post-tri-

al motion within the mandatory 10-day period prescribed by Federal Rules 50 and 59. Fed.R.Civ.P. 50 and 59. Second, Armstrong did not object to the court's instruction on the issue of knowledge and, pursuant to Rule 51, a party may not assign as error the giving of a jury instruction absent timely objection. Fed.R.Civ.P. 51.

It is clear that a district court is without authority to grant a new trial or enter judgment N.O.V. for reasons advanced after the mandatory 10-day period has expired. *Arkwright Mutual Insurance Co. v. Philadelphia Electric Co.*, 427 F.2d 1273, 1275–76 (3d Cir. 1970). Here, defendant raised the issue for the first time, not in a pleading, but rather in a brief which was filed over two months following the entry of judgment. Since Armstrong has made no showing of extraordinary circumstances under Rule 60(b), this court is without authority to consider the contention.

In addition, at the close of the testimony, the parties submitted requested points for charge in accordance with Rule 51. Fed.R.Civ.P. 51. Armstrong's request No. 3 provided:

> You must find that the defendant A. J. Armstrong Co., Inc., did not convert either the meats or proceeds in question unless you find that A. J. Armstrong Co., Inc., had actual knowledge, at the time that the meats were in the possession and/or control of Kress-Dobkin and/or K & D, that these meats were definitely on consignment.

Significantly, plaintiffs had urged the court to instruct the jury that Armstrong could be liable for conversion if it knew or should have known that the meat was shipped by plaintiffs on consignment. (T.284). The court rejected plaintiffs' suggestion and instructed the jury as requested by Armstrong, i. e., they should find Armstrong liable to plaintiffs for conversion only if "Armstrong had actual knowledge that the goods were consigned" to Kress-Dobkin.[7] (T.708).

---

6. We have carefully reviewed the remaining contentions raised in Armstrong's motion. These contentions are not discussed in Armstrong's brief, nor were they advanced at oral argument. We find them to be without merit.

7. The court's instructions concerning Armstrong's liability provided as follows:

> Now the plaintiffs have also filed suit against A. J. Armstrong Company contend-

Special interrogatories were then submitted to the jury in accordance with Rule 49. Fed.R.Civ.P. 49. As to Armstrong, the court inquired:

(3) Did the A. J. Armstrong Co., Inc., know that the meat shipped by Moree Meat Limited was held by Kress-Dobkin Co., Inc., on consignment?

(4) Did the A. J. Armstrong Co., Inc., know that the meat shipped by GBS Meat Industries Limited was held by Kress-Dobkin Co., Inc., on consignment?

At the close of its charge, the district court asked the parties if they "had any advice." (T.712). Counsel for Kress-Dobkin made an objection on an unrelated matter, whereupon the court inquired of counsel for Armstrong concerning any objections. Counsel stated: "No, I have nothing." (T.712).

■ It is clear that Armstrong did not advance the position, which it now asserts as controlling, either before or after the instructions to the jury. The instruction on

> ing that it is also liable to the plaintiffs for conversion.
>
> Plaintiffs' contention against Armstrong is based upon the theory that the meat was consigned to Kress-Dobkin Company and A. J. Armstrong, through its employees, knew of the consignment.
>
> Plaintiffs argue that since A. J. Armstrong knew of the consignment, it knew that title to the meat remained in the plaintiffs and, therefore, A. J. Armstrong is obligated to remit the proceeds of the meat which Armstrong obtained from Kress-Dobkin Company to the plaintiffs.
>
> On the other hand, A. J. Armstrong argues that it is not liable to the plaintiffs for conversion. Armstrong denies that any employee knew of the consignment, if one existed. Therefore, Armstrong contends that it is entitled to retain the proceeds pursuant to a security agreement which it had executed with David Dobkin, Kress-Dobkin and K & D Meat Company.
>
> The security agreement accorded Armstrong the right to the proceeds from the sale of all inventory, as well as the accounts receivables.
>
> Now the law provides where goods are delivered to a person and such person maintains a place of business at which he deals in goods of the kind involved under a name other than the name of the person making

knowledge was not objected to by counsel and, in fact, was requested by Armstrong.

Rule 51 of the Federal Rules of Civil Procedure provides:

> At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury.

The reason for this Rule was ably explained in *Porter v. American Export Lines, Inc.*, 387 F.2d 409 (3d Cir. 1968).

> delivery, then the goods are subject to the claims of the recipient's creditors.
>
> This is true even if the goods are delivered to that person on consignment.
>
> Now here plaintiffs delivered the goods to Kress-Dobkin Company. Kress-Dobkin Company maintained a place of business at which it dealt in meat. We have heard about McNeilly Road and some other public warehouses.
>
> David Dobkin used the name Kress-Dobkin and K & D Meat Company; that is, a name other than Moree or GBS.
>
> As a result, the proceeds of any sale by Dobkin or Kress-Dobkin, or K & D Meat must be paid to A. J. Armstrong unless Armstrong had actual knowledge that the goods were consigned to the plaintiffs.
>
> The reason for this rule is to protect creditors, such as Armstrong, unless they knew of the consignment. Thus, you must decide whether A. J. Armstrong, by its employees, knew of the alleged consignment from plaintiffs to Kress-Dobkin. If Armstrong knew of the consignment, plaintiffs are entitled to recover against Armstrong for conversion. But if Armstrong did not know of the consignment, then Armstrong is not guilty of conversion because it is entitled to the proceeds pursuant to its security agreement.
> (T.707–709.)

The purpose of Rule 51 of the Federal Rules of Civil Procedure, regarding jury instructions and objections thereto, is to afford the trial judge an opportunity to correct the error in his charge before the jury retires to consider its verdict . . .

*Id.* at 412. Thus, a district court should not grant a motion for post-trial judgment or a new trial where the losing party requests the trial judge to consider a new theory which could have been raised during the original proceedings. *Grumman Aircraft Engineering Corp. v. Renegotiation Board,* 157 U.S.App.D.C. 121, 132, 482 F.2d 710, 721 (D.C.Cir. 1973); *see also,* 6A J. Moore, Federal Practice ¶ 59.07 (1972).

■ However, even assuming arguendo that Armstrong had preserved its objection on the question of knowledge, we nevertheless believe the motion for judgment or new trial must be denied. In considering Armstrong's motion for judgment N.O.V., the court must determine whether there is substantial evidence to support the jury's verdict. Such a motion may not be granted unless, as a matter of law, the court finds that plaintiffs have failed to present a case to the jury. *Neville Chemical Co. v. Union Carbide Corp.,* 422 F.2d 1205, 1210 (3d Cir. 1970). The evidence and all reasonable inferences therefrom must be viewed in a light most favorable to the verdict winner. *Thomas v. E. J. Korvette, Inc.,* 476 F.2d 471 (3d Cir. 1973).

■ On the other hand, in considering a motion for new trial, a trial court has greater discretion. It may set aside a verdict because it is against the clear weight of the evidence, the damages are excessive, or substantial trial errors have occurred. *Neville Chemical Co. v. Union Carbide Corp., supra* at 1221. However, when the evidence is in conflict, a trial judge should be more reluctant to grant a new trial. *Byce v. American Honda Motor Co., Inc.,* 59 F.R.D. 63 (W.D.Pa.1973).

■ In the instant case, we are satisfied that our instructions on the question of Armstrong's liability comported with the law. 12A P.S. § 2–326(3) provides:

Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as 'on consignment' or 'on memorandum.' However, this subsection is not applicable if the person making delivery

(a) complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or

(b) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or

(c) complies with the filing provisions of the Article on Secured Transactions (Article 9).

This section gives priority to secured creditors, such as Armstrong, over consignors such as the plaintiffs when each makes a claim to consigned goods or the proceeds from the sale of such goods and the secured creditor has been misled. The official comments to § 2–326 of the Code provide:

The purpose of the exception is merely to limit the effect of the present subsection itself . . . to cases in which creditors of the buyer may reasonably be deemed to have been misled by the secret reservation.

Official Comment to § 2–326 at ¶ 2.

Armstrong would have us place a literal construction on this section and absolve it from liability unless exceptions (a), (b), or (c) to § 2–326(3) were satisfied by plaintiffs. We reject such a narrow reading of these provisions because to do so would grant preference to a creditor who had knowledge of the rights of another and therefore was not misled when credit was extended.

The case law discussing the contention asserted by Armstrong is meager at best;

however, the language in several of the leading cases analyzing § 2–326 indicates that a consignor should prevail over a secured creditor who has actual knowledge of the consignment.[8] Thus, in *Columbia International Corp. v. Kempler*, 46 Wis.2d 550, 175 N.W.2d 465 (1970), the court stated:

[R]egardless of how desirable this conceptualization of a consignment contract is from the point of view of the consignor, it violates the principle of apparent or ostensible ownership: People should be able to deal with a debtor upon the assumption that all property in his possession is unencumbered, unless the contrary is indicated by their own knowledge or by public records.

175 N.W.2d at 469; *accord, Bufkor, Inc. v. Star Jewelry Co.. Inc.*, 552 S.W.2d 522 (Tex. Civ.App.1977). Similarly, in *In Re Gross Manufacturing and Importing Co., Inc.*, 328 F.Supp. 905 (D.N.J.1971), the court stated:

From the comments to § 2–326 of the Code, and other scholarly commentary in that area, it can be seen that the purpose of subsection (3) was to apply to " . . . cases in which creditors of the buyer may reasonably be deemed to have been misled by the secret reservation."

*Id.* at 909.[9]

The clear import of the comments to § 2–326, and the judicial precedents discussed above establish that, where a secured creditor knows that the proceeds rightfully belong to a consignor, the consignor must have priority. Any other construction of § 2–326 would contravene the intent of that section and would sanction intentional conversions of goods or proceeds.

■ Armstrong also seeks judgment N.O.V. or a new trial on the grounds that there was insufficient evidence to support the verdict and the weight of the evidence is against the verdict. We disagree.

As our earlier summary of the evidence indicates, Armstrong exercised pervasive control over Kress-Dobkin's operations. Supervision of Kress-Dobkin intensified during the period of the meat transaction involving plaintiffs. Armstrong paid Moree Meat on two earlier consignment arrangements with Kress-Dobkin and paid the custom charges on the five loads of beef involved in this case. Taken as a whole, the jury could reasonably infer that Armstrong knew that the meat was shipped to Kress-Dobkin by plaintiffs on consignment.

Accordingly, Armstrong's motion for judgment N.O.V. or a new trial must be denied.

---

8. As noted earlier, the instant case involves a true consignment; therefore, Article 9 of the Code is inapposite. We express no opinion on the question of priority or the relevance of actual knowledge of a secured creditor if this case was governed by Article 9.

9. For an excellent discussion of the history and rationale of § 2–326, see Annot., 40 A.L.R.3d 1078 (1971).