[No. D053162. Fourth Dist., Div. One. Oct. 7, 2009.]

BEHYAR FARIBA, Plaintiff and Appellant, v.
DEALER SERVICES CORPORATION, Defendant and Appellant.

158

## COUNSEL

Law Offices of Paul D. Turner & Associates, Paul D. Turner; Law Offices of Zvi "Hershy" Silver and Zvi Aria Silver for Plaintiff and Appellant.

Prenovost, Normandin, Bergh and Dawe, Tom R. Normandin, Jr., and Paula M. Harrelson for Defendant and Appellant.

## OPINION

**NARES, J.**—On these appeals we are confronted with an issue of first impression that centers on the interpretation of those portions of the California Uniform Commercial Code[1] dealing with the priority of security interests in personal property among competing creditors. Specifically, where a secured creditor of a business has actual knowledge that the business is substantially engaged in selling the goods of others, i.e., consignment sales, are the rights of the consignor superior to those of the secured creditor? We hold that they are.

## INTRODUCTION

Plaintiff Behyar Fariba is an automobile wholesaler. California Auto Sales & Leasing (CASL), which is not a party to this action, was an independent retail automobile dealer to which Fariba provided vehicles on a consignment basis. Defendant Dealer Services Corporation (DSC) is a finance company that financed CASL's inventory under a written promissory note and had a perfected security interest in, among other things, CASL's inventory of vehicles.

When CASL went out of business and Fariba attempted to retrieve his vehicles, he discovered 14 of his vehicles were being repossessed by DSC. When DSC refused to return the vehicles, Fariba sued. At trial, the court dismissed Fariba's fraud and breach of contract causes of action, as well as his claim for punitive damages. The case went to the jury solely on the issue of who—Fariba or DSC—had priority under the California Uniform Commercial Code as to the vehicles.

The special verdict form asked the jury to answer two questions: (1) Did DSC have actual knowledge that CASL was substantially engaged in the sale of vehicles belonging to others; and (2) who had possession of the 14 vehicles at issue in the dispute. The jury answered "yes" to the first question and "Brian Fariba" to the second. The court entered judgment in Fariba's favor, awarding possession of the vehicles and $32,500 in damages.

DSC appeals, asserting (1) the court erroneously instructed the jury that Fariba's interest in his consigned vehicles had priority over that of DSC if DSC had "actual knowledge" CASL was substantially engaged in selling

---

[1] All further statutory references are to the California Uniform Commercial Code unless otherwise specified.

vehicles that belonged to others; (2) there is no substantial evidence DSC had actual knowledge CASL was substantially engaged in selling vehicles that belonged to others; (3) Fariba's security interest was subordinate to that of DSC because he did not file a UCC-1 financing statement; (4) the court erred in instructing the jury on the issue of possession; and (5) there is no substantial evidence to support the jury's finding Fariba had possession of the vehicles.

Fariba also appeals, asserting the court erred by granting a directed verdict on his fraud and breach of contract claims, as well as on his claim for punitive damages.

We conclude that (1) the court properly instructed the jury that Fariba's interest in his consigned vehicles was superior to that of DSC if DSC had actual knowledge CASL was substantially engaged in selling vehicles that belonged to others; and (2) there is substantial evidence DSC had such knowledge. We also conclude the court properly instructed the jury on the definition of possession, and there is substantial evidence to support the jury's finding Fariba had possession of the vehicles. We further conclude that, because we are upholding the jury's verdict in favor of Fariba, we need not address whether the court erred in granting a directed verdict on Fariba's fraud and breach of contract claims. Finally, we conclude the court did not err in granting a directed verdict on Fariba's claim for punitive damages.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *CASL*

CASL was a used car retailer located on the parking lot of the San Diego Sports Arena. A substantial portion of CASL's inventory consisted of vehicles owned by others who delivered them to CASL on a consignment basis. The owners would get paid by CASL only when the vehicles were sold.

### B. *Fariba's Relationship with CASL*

Beginning in 2005, Fariba entered into a relationship with CASL whereby Fariba delivered vehicles to CASL. They agreed on a price for the vehicle and, when CASL sold the vehicle, Fariba received an established price for the vehicle. Fariba held title to the vehicles and released title to CASL only upon receiving payment for the vehicles.

From September 2005 forward, Fariba supplied approximately 45 percent of CASL's inventory. Fariba, however, did not file a UCC-1 financing statement to perfect his interest in the vehicles.

C. *DSC's Relationship with CASL*

In October 2005 CASL executed a promissory note in favor of DSC, a used car dealer finance company, in the amount of $200,000. DSC secured the loan to CASL with a security interest in CASL's entire inventory, including after-acquired inventory. DSC filed a UCC-1 financing statement covering its security interest in the inventory.

D. *DSC's Knowledge of CASL's Consignment Sales*

CASL was introduced to DSC by Marina Colli, who worked for Automotive Finance Company (AFC), CASL's then finance company. When Colli left AFC to work for DSC, she convinced CASL to close their account with AFC and deal with DSC. Colli was DSC's manager in San Diego County and was in charge of the CASL account.

Fariba testified that Colli told him that she always knew that CASL was substantially engaged in selling goods that belonged to others. Colli told Fariba that she acquired the information from Rex Garwick and Carmine Malanga, the owners of CASL, while she worked with AFC, prior to the time CASL entered into the loan agreement with DSC.

John Denardo, CASL's car lot manager, testified that prior to DSC's loan to CASL he saw Colli on CASL's lot inspecting the vehicle inventory. Additionally, DSC sent people to CASL's lot on a monthly basis. Denardo also testified that he had conversations with Colli about the fact that CASL was selling vehicles on consignment. While Denardo testified that he was not certain when the conversation occurred, he said that it occurred sometime between 2002 or 2003 and July 2006.

Garwick testified that prior to CASL's obtaining the loan from DSC, Colli knew that CASL was substantially engaged in selling vehicles that belonged to others. Specifically, he testified that Colli was at CASL's lot "numerous times from the beginning of 2005 until the middle of 2006" and that CASL worked with Colli for a few years prior to October 2005. He testified that when CASL obtained the loan from DSC, Colli was "well aware" of the nature of their business. When Colli performed inventory audits at CASL, she would ask him to distinguish which vehicles were owned by CASL and which were on consignment.

E. *CASL Defaults on Note*

In July 2006 CASL went out of business and defaulted on its note with DSC. At the time, Fariba had approximately 45 vehicles on CASL's lot. On

or around July 10, Fariba terminated his relationship with CASL and demanded his vehicles back. The owner of CASL agreed and told Fariba he could retrieve his vehicles at any time.

Fariba arranged for drivers and began retrieving his vehicles from CASL. After moving approximately 31 of the vehicles, Fariba's drivers returned to CASL's lot and found tow trucks working on behalf of DSC repossessing CASL's inventory. One of Fariba's drivers called Fariba and told him what was happening. Fariba talked to Colli at DSC. According to Fariba, they agreed DSC would be allowed to take Fariba's remaining vehicles and, when DSC verified that Fariba held title to the vehicles, they would be returned to Fariba. Fariba agreed to give DSC the keys to the vehicles so DSC would not have to make new keys for the cars it was repossessing. According to Fariba, later in the day Colli and another representative of DSC, Floyd Smith, again confirmed the arrangement by phone. In total, DSC took 14 of Fariba's vehicles, each of which Fariba held title to.

The next day, however, DSC refused to return the 14 vehicles to Fariba. When Fariba spoke with Colli and Smith, Fariba alleges they told him they were instructed to tell him the day before that he would get his vehicles back even though DSC had no intention of returning the vehicles. According to Fariba, he also spoke with John Wick, DSC's corporate counsel, who told him DSC "conned" and "tricked" Fariba in order to get the vehicles from him.

### F.   *The Lawsuit*

In July 2006 Fariba filed suit against DSC and others. He alleged claims against DSC for breach of contract, goods delivered, fraud, wrongful possession, unfair business practices, quiet title, and declaratory relief. The breach of contract and fraud claims, as well as the claim for punitive damages, were based upon Fariba's conversation with Colli and his agreement to give her the keys to the vehicles in exchange for her (and DSC's) alleged agreement to return the vehicles if he could prove ownership.

### G.   *The Trial*

#### 1.   *Motion in limine*

Prior to trial, DSC filed a motion in limine seeking to exclude any evidence DSC knew that CASL was substantially engaged in selling vehicles that belonged to others. Fariba opposed the motion, arguing the information was

relevant to proving who had superior title to the vehicles under the California Uniform Commercial Code. The court denied the motion, noting that while there was no California authority on point, cases from other jurisdictions had held that a creditor's actual knowledge of the fact the business dealt in consigned goods made the consignor's interest prevail over that of the creditor. Therefore, the court found evidence of DSC's actual knowledge relevant.

### 2. *Motion for directed verdict*

At the close of presentation of Fariba's case-in-chief, DSC moved for a directed verdict on Fariba's breach of contract, fraud and punitive damages claims. The court granted the motion. In doing so, the court found that by the time Fariba had his alleged conversation with Colli, the cars were already controlled by DSC, in a separate parking lot, and the only thing that changed hands were the keys, to avoid DSC's having to rekey the vehicles. The court found that "this is fundamentally a commercial dispute between two claimants to the same physical property . . . . The court does not find that there is—sufficient evidence of a legally cognizable contract entered into between and by the parties that was supported by consideration." The court further found there were not "demonstrable damages as a result of this because the parties would have been in exactly the same place . . . regardless of who had physical possession of the cars." The court noted that "[t]his case is fundamentally and solely about who had priority under the California [Uniform] Commercial Code with respect to those cars . . . ." The court ruled that the case would go to the jury solely on the issue of who had priority under the California Uniform Commercial Code.

### 3. *Jury instructions*

Fariba sought to impose liability on DSC under a theory it had knowledge CASL was substantially engaged in selling vehicles that belonged to others. In this regard, the court instructed the jury in special jury instruction No. 4, as follows: "Brian Fariba holds a superior interest in the 14 vehicles, if Brian Fariba proves, by a preponderance of the evidence, that Dealer Services Corporation had actual knowledge in October of 2005 that California Auto Sales and Leasing was substantially engaged in selling of the goods of others." In special jury instruction No. 5, the court instructed the jury, "California Auto Sales and Leasing is considered to be substantially engaged in selling vehicles that belong to others if 20 percent or more of its inventory belonged to others."

As an alternative theory of liability, Fariba sought to prove that at the time DSC sought to repossess his vehicles, he legally had "possession" of them, rendering DSC's rights subordinate to his. On the issue of possession of the vehicles, the court instructed the jury, "Possession as between competing claimants to vehicles in inventory at the premises of a vendor is accomplished when one with the right to possess accomplishes *actual* custody and control of the vehicle under all of the circumstances demonstrated by the evidence." (Italics added.)

DSC objected to this instruction, arguing the court should have instructed the jury possession is accomplished by "physical" possession and control, instead of "actual" possession and control.

4.  *Special verdict*

In the special verdict form the jury was asked to answer two questions:

"Question 1: Did Dealer Services Corporation have actual knowledge in October 2005 that California Auto Sales and Leasing was substantially engaged in the sale of vehicles that belonged to others?"

"Question 2: Who obtained possession of the fourteen (14) vehicles from California Sales and Leasing?"

The jury answered "yes" to question No. 1 and "Brian Fariba" to question No. 2.

The court thereafter awarded Fariba possession of the 14 vehicles as well as a stipulated amount of $32,500 for diminution in value of the vehicles.

## DISCUSSION

### I.  *DSC'S APPEAL*

A.  *Court's Instruction on Actual Knowledge*

1.  *Standard of review*

We review the court's alleged error in instructing the jury de novo. (*Sander/Moses Productions, Inc. v. NBC Studios, Inc.* (2006) 142 Cal.App.4th 1086, 1094 [48 Cal.Rptr.3d 525].)

2.  *"General knowledge" exception to creditors' perfected security interest in consigned goods*

■ Case law defines a consignment sale as "one in which the merchant takes possession of goods and holds them for sale with the obligation to pay

the owner for the goods from the proceeds of a sale by the merchant. If the merchant does not sell the goods the merchant may return the goods to the owner without obligation. [Citation.] In a consignment sale transaction, title to the goods generally remains with the original owner." (*Bank of California v. Thornton-Blue Pacific, Inc.* (1997) 53 Cal.App.4th 841, 847 [62 Cal.Rptr.2d 90].)

To analyze Fariba's rights, we turn to section 9319, which sets forth guidelines for determining the rights of consignees with respect to creditors of the consignee: "(a) Except as otherwise provided in subdivision (b), for purposes of determining the rights of creditors of, and purchasers for value of goods from, a consignee, while the goods are in the possession of the consignee, the consignee is deemed to have rights and title to the goods identical to those the consignor had or had power to transfer. [¶] (b) For purposes of determining the rights of a creditor of a consignee, law other than this division determines the rights and title of a consignee while goods are in the consignee's possession *if, under this chapter, a perfected security interest held by the consignor would have priority over the rights of the creditor.*" (Italics added.)

The official comments to section 9319, subdivision (a) state: "[F]or purposes of determining the rights of certain third parties, *the consignee is deemed to acquire all rights and title that the consignor had, if the consignor's security interest is unperfected.* The consignee acquires these rights even though, as between the parties, it purchases a limited interest in the goods (as would be the case in a true consignment, under which the consignee acquires only the interest of a bailee). *As a consequence of this section, creditors of the consignee can acquire judicial liens and security interests in the goods.*" (Official Comments on U. Com. Code, 23B pt. 2 West's Ann. Cal. U. Com. Code (2002 ed.) foll. § 9319, p. 364, italics added.)

However, section 9102, subdivision (a)(20)(A)(iii) provides a transaction is not deemed a consignment subjecting the consignor's goods to the claims of the consignee's creditors if the consignee is "generally known" by its creditors to be substantially engaged in selling the goods of others: "(20) '*Consignment*' *means a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and all of the following conditions are satisfied:* [¶] (A) *The merchant satisfies all of the following conditions:* [¶] (i) He or she deals in goods of that kind under a name other than the name of the person making delivery. [¶] (ii) He or she is not an auctioneer. [¶] (iii) *He or she is* not *generally known by its creditors to be substantially engaged in selling the goods of others.*" (Italics added.)

■ Thus, "[a] consignor may prevent the application of . . . [Uniform Commercial Code[2]] §§ 9-102(a)(20) & 9-319(a) if it qualifies for one of the two exceptions provided under California law. [Citations.] . . . The consignor must either have (1) filed a UCC-1 financing statement as required under [Uniform Commercial Code] Article 9 or (2) prove that the deliveree is generally known by his creditors to be substantially engaged in selling the goods of others. [Citations.] If either of these notice requirements of [Uniform Commercial Code] Article 2 are met, then [Uniform Commercial Code] . . . §§ 9-102(a)(20) & 9-319(a) will not apply and the consignee's creditors may not reach the consigned goods in the consignee's possession." (*In re Valley Media, Inc.* (Bankr. D.Del. 2002) 279 B.R. 105, 123, fn. omitted [applying California law].)[3]

Here, however, Fariba did not attempt to prove at trial that it was "generally known" by CASL's creditors that CASL was substantially engaged in selling the goods of others. Rather, Fariba sought to prove, and the jury found, that DSC had *actual* knowledge CASL was substantially engaged in selling the property of others. Thus, we are presented with an issue of first impression in California: Does actual knowledge of a creditor with a perfected security interest in the inventory of a business that the business is substantially engaged in selling goods of others, i.e., selling goods on a consignment basis, defeat the right of that creditor in the consigned goods? We hold that it does, and the court therefore did not err in instructing the jury on the question of DSC's actual knowledge.

### 3. *Policy underlying Uniform Commercial Code consignment law supports "actual knowledge" exception*

One problem with consignment arrangements is they may create secret liens where a creditor of the consignee does not know the consignee does not own the consigned merchandise. (*Escrow Connection v. Haas* (1987) 189 Cal.App.3d 1640, 1644 [235 Cal.Rptr. 200] (*Haas*).) As the Court of Appeal explained in *Haas*: "Before the introduction of the Uniform Commercial Code, even though the interest of a consignor was commonly viewed as a 'secret lien against creditors . . . ,' a consignor could nevertheless retrieve the consigned goods in a contest with the consignee's creditors. The draftsmen of

---

[2] To distinguish it from the California Uniform Commercial Code, we refer to the national code as the Uniform Commercial Code.

[3] Case law from other jurisdictions applying our Commercial Code, the Uniform Commercial Code, or the uniform code of other states, is considered good authority in litigation arising under the California act. (*Porter v. Gibson* (1944) 25 Cal.2d 506, 512 [154 P.2d 703]; 4 Witkin, Summary of Cal. Law (10th ed. 2005) Sales, § 10, p. 30.)

the Uniform Commercial Code effectively did away with the 'secret lien' by providing, where a consignment be intended for security, that the consignor must file a financing statement under article IX of the Uniform Commercial Code. The drafters also provided that *all goods on consignment*—whether or not so placed to 'secure' the consignor—*are subject to the claims of the consignee's creditors if the consignor fails to comply with the notice requirements of article II* of the Uniform Commercial Code." (*Haas, supra*, at p. 1644, fn. omitted.) The "notice requirements" that exempt all consignors' goods from claims of creditors is now codified in section 9319, subdivision (a) and requires the consignor to either "(1) file a financing statement or (2) *prove that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others on consignment.*" (*Haas*, at p. 1644, fn. 3, italics added.)

The official comment to former section 2326, subdivision (3), the predecessor to section 9319, subdivision (a), further explains the policy behind the notice exception to creditors' priority rights as against consignors: "Pursuant to the general policies of this Act which require good faith not only between the parties to the sales contract, but as against interested third parties, subsection (3) resolves all reasonable doubts as to the nature of the transaction in favor of the general creditors of the buyer. . . . A necessary exception is made where the buyer is known to be engaged primarily in selling the goods of others . . . or the seller complies with the filing provisions of Article 9 as if his interest were a security interest. . . . *The purpose of the exception is merely to limit the effect of the present subsection itself . . . to cases in which creditors of the buyer may reasonably be deemed to have been misled by the secret reservation.*" (Official Comments on U. Com. Code, 23A pt. 1 West's Ann. Cal. U. Com. Code (2002 ed.) foll. § 2326, p. 397, italics added.)

It follows from this authority that since the purpose of the notice exception is to "protect creditors from the 'hidden' claim of the consignor, it should follow that a creditor of a consignee who has *actual knowledge* that the consignee is a consignee cannot claim the protection thereof." (3A Lawrence's Anderson on the Uniform Commercial Code (3d ed. 2009 supp.) Sales, § 2-326:97, italics added [interpreting U. Com. Code, § 2-326].)

Moreover, as will be seen, *post*, the weight of authority from other jurisdictions also holds that where a creditor has actual knowledge the consignee is substantially engaged in the sale of property belonging to others, the creditor's security interest does not have priority over the consignor's. We find this authority consistent with the policy underlying the Uniform

Commercial Code's notice exception, the language of the statute, and rules of statutory interpretation.

### 4.  *Out-of-state authority supports "actual knowledge" exception*

In *Belmont Internat., Inc. v. American Internat. Shoe Co.* (1992) 313 Or. 112 [831 P.2d 15], a consignor asserted it had priority over the claims of the consignee's creditor, even though it had not filed a UCC-1 financing statement and had not shown it was generally known to creditors that the consignee was substantially engaged in selling goods belonging to others, because the creditor had *actual* knowledge the relationship was one of consignor and consignee. (*Id.*, 831 P.2d at pp. 18–19.) The Oregon Supreme Court agreed, holding that a narrow construction of the notice exception would "negate the policy" behind Oregon's version of Uniform Commercial Code section 2-326. (*Belmont Internat., Inc., supra*, at p. 19.) Because the policy of Uniform Commercial Code section 2-326 "is to protect the creditors of a consignee from the consignor's hidden liens on the consignment goods," "[t]he assumption is that, '[w]here a secured creditor has knowledge of consignments, he will certainly not advance funds to the consignee based on the consignee's possession of the consigned property.' [Citation.]" (*Belmont Internat., Inc., supra*, 831 P.2d at p. 19.) Thus, "in a dispute between a consignor and a creditor of the consignee as to priority in the consigned goods, proof that the creditor actually knew of the consignment before becoming a creditor is sufficient . . . ." (*Ibid.*)

Several other cases have reached the same result. (See *Eurpac Service v. Republic Acceptance Corp.* (Colo.Ct.App. 2000) 37 P.3d 447, 450–451 (*Eurpac*); *First National Bank v. Olsen* (Minn.Ct.App. 1987) 403 N.W.2d 661 [under a Minnesota statute similar to § 9319, an exemption exists if the secured creditor had actual knowledge of the consignment]; *GBS Meat Industry Pty. Ltd. v. Kress-Dobkin Co.* (W.D.Pa. 1979) 474 F.Supp. 1357, 1362–1363 (*GBS*) [failure to permit an exception when a creditor has actual knowledge would contravene the intent of U. Com. Code, § 2-326 and "sanction intentional conversions of goods or proceeds"]; 3A Lawrence's Anderson on Uniform Commercial Code, *supra*, § 2-326:94 [noting that a creditor is estopped from making a claim under U. Com. Code, § 2-326(3) when the creditor in fact knew that the consignee was holding the goods in that capacity].)[4]

---

[4] One case has rejected the "actual notice" exception. (See *In re State Street Auto Sales, Inc.* (Bankr. D.Mass. 1988) 81 B.R. 215, 218–220.) However, we find the reasoning of the overwhelming majority of jurisdictions finding such an exception persuasive.

As the Colorado Court of Appeals explained, "Failure to acknowledge an 'actual knowledge' exception would lead to an absurd result. [Citation.] The effect of the literal language of the exception is to impute knowledge of the consignment arrangement to all creditors if the knowledge is 'generally known.' In other words, a creditor is held to knowledge which he or she could reasonably have obtained because it was 'generally known' by other creditors. It would be absurd to hold a creditor responsible for imputed knowledge but not hold the same creditor responsible for actual knowledge. [¶] We find the analysis employed by courts holding that actual knowledge establishes the exception of [Colorado Revised Statutes] § 4-2-326(3)(b) [(1999)] [Colorado's equivalent to § 9319 & Uniform Commercial Code § 2-326], more persuasive. This interpretation gives full effect to the purpose of the statute as explained in the official comments. [Citation.] It does not burden creditors with 'secret liens' while providing limited protection to consignors who never intended to lose title to their property. It also avoids the result of giving greater weight to imputed knowledge than actual knowledge." (*Eurpac, supra,* 37 P.3d at pp. 450–451.)

As the court in *Matter of High-Line Aviation, Inc.* (Bankr. N.D.Ga. 1992) 149 B.R. 730, 737 stated, "if a creditor knows that goods in a debtor's place of business are on consignment, the creditor is not misled by the presence of the consigned goods and its lien should not extend to them."

We also conclude that construing the knowledge exception to include constructive knowledge, but not actual knowledge, would lead to absurd results and we shall not interpret our Commercial Code in such a manner. (*Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278, 290 [64 Cal.Rptr.3d 661, 165 P.3d 462] [statutory interpretation must avoid absurd results the Legislature would not have intended].) In construing a statute, courts employ the rule "that a statute 'must be given a reasonable and common sense interpretation consistent with the apparent purpose and intent of the lawmakers, practical rather than technical in nature, which upon application will result in wise policy rather than mischief or absurdity.' " (*Welch v. Oakland Unified School Dist.* (2001) 91 Cal.App.4th 1421, 1428 [111 Cal.Rptr.2d 374].)

Construing sections 9313 and 9102 to provide an exception where creditors have actual knowledge of the consignment arrangement is consistent with the purpose of the statute: It does not burden creditors with secret liens and avoids the absurd result of giving greater weight to imputed knowledge than actual knowledge. Further, section 1103 provides that the California Uniform Commercial Code "shall be liberally construed and applied to promote its underlying purposes and policies." Thus, because construing the

applicable provisions to contain an "actual knowledge" exception is consistent with the underlying purpose behind such provisions, and a narrow, literal reading would lead to absurd results, the court did not err in instructing the jury and crafting a special verdict form that provided Fariba with priority over DSC's claims if Fariba could show DSC had actual knowledge CASL was substantially engaged in selling the goods of others.

### 5. Fariba's failure to file a UCC-1 financing statement

DSC asserts that as a matter of law it held a perfected security interest in the vehicles that had priority over Fariba's because it filed a UCC-1 financing statement and Fariba did not. This contention is unavailing.

As explained, *ante*, a consignor has priority over creditors' claims against a consignee if (1) the consignor has filed a UCC-1 financing statement *or* (2) the creditors have knowledge a substantial amount of the consignee's business is in selling consigned goods. (*Haas, supra,* 189 Cal.App.3d at p. 1644, fn. 3; *In re Valley Media, Inc., supra,* 279 B.R. at p. 123.) Thus, there is no merit to DSC's contention that Fariba could have priority only if it had filed a UCC-1 financing statement prior to DSC's filing one.

### B. There Is Substantial Evidence of DSC's Actual Knowledge

DSC contends that even if its actual knowledge of the consignment arrangement defeats its claim to the consigned vehicles, the judgment must still be reversed as there is no substantial evidence it had actual knowledge of Fariba's consignment arrangement with CASL. We reject this contention.

### 1. Standard of review

Under the substantial evidence standard of review, we review the entire record to determine whether there is substantial evidence supporting the jury's factual determinations (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874 [197 Cal.Rptr. 925]), viewing the evidence and resolving all evidentiary conflicts in favor of the prevailing party and indulging all reasonable inferences to uphold the judgment (*Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1254–1255 [54 Cal.Rptr.2d 340]). The issue is not whether there is evidence in the record to support a different finding, but whether there is some evidence that, if believed, would support the findings of the trier of fact. (*Rupf v. Yan* (2000) 85 Cal.App.4th 411, 429–430, fn. 5 [102 Cal.Rptr.2d 157].) Credibility is an issue of fact for the trier of fact to resolve

(*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622 [34 Cal.Rptr.2d 26]), and the testimony of a single witness, even a party, is sufficient to provide substantial evidence to support a factual finding (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479]).

### 2. *Analysis*

DSC does not contend there is no substantial evidence CASL was "substantially engaged" in selling vehicles that belonged to others. Rather, its only contention is there is no substantial evidence it had actual knowledge of Fariba's consignment arrangement with CASL. However, a review of the evidence in the light most favorable to the judgment shows substantial evidence supports the jury's verdict that it did.

As detailed, *ante*, Colli, DSC's manager in San Diego, had a preexisting relationship with CASL through her prior employer and knew the nature of CASL's business. Her actions were consistent with this knowledge, performing vehicle audits whereby she asked CASL to segregate the vehicles owned by CASL from those owned by others. Three separate witnesses testified to Colli's knowledge CASL was substantially engaged in selling vehicles owned by others.

DSC attempts to attack this evidence by calling the testimony "uncorroborated," "vague" and "not specific as to time." However, the testimony of a single witness, even a party, is sufficient to provide substantial evidence to support a factual finding. (*In re Marriage of Mix, supra*, 14 Cal.3d at p. 614.) Moreover, credibility determinations are for the trier of fact and we will not reweigh them on appeal. (*Johnson v. Pratt & Whitney Canada, Inc., supra*, 28 Cal.App.4th at p. 622.)

DSC also asserts that Fariba should have been required to show "evidence that DSC knew of Fariba or any specific Fariba consignment before becoming a creditor." In support of this argument, DSC points out that in *GBS, supra*, 474 F.Supp. 1357 and *Eurpac, supra*, 37 P.3d 447, the creditors had actual knowledge of the particular consignment arrangement and/or particular goods that were consigned. However, it is not important whether DSC knew the identities of each and every consignor or which particular vehicles were on consignment. What is important is that DSC had actual knowledge that *CASL* was substantially engaged in selling vehicles that belonged to others. "[I]f a creditor knows that goods in a debtor's place of business are on consignment, the creditor is not misled by the presence of the consigned

goods and its lien should not extend to them." (*Matter of High-Line Aviation, Inc., supra,* 149 B.R. at p. 737.) Moreover, based upon Colli's inventory audits, a jury could infer DSC had actual knowledge not only of CASL's business model, but also its arrangement with Fariba.

## C. *Court's Instruction on Possession*

DSC asserts the court erred when it instructed the jury on who had possession of the 14 vehicles DSC seized because it failed to instruct the jury that to have possession one needs to have "physical" custody and control. This contention is unavailing.

### 1. *Background*

DSC asserted at trial that the jury should be instructed that a determination of whether Fariba or DSC had possession of the 14 vehicles DSC seized must be based upon who had "physical" custody and control of the vehicles. The court rejected this argument, instead instructing the jury, as discussed, *ante,* as follows: "Possession as between competing claimants to vehicles in inventory at the premises of a vendor is accomplished when one with the right to possess accomplishes *actual custody and control* of the vehicle under all of the circumstances demonstrated by the evidence." (Italics added.)

As we have also discussed, *ante,* the jury was given the following question on its special verdict form, "Who obtained possession of the fourteen (14) vehicles from California Sales and Leasing?" The jury answered the question, "Brian Fariba."

### 2. *Analysis*

Fariba's alternative basis for claiming a right to the 14 vehicles seized by DSC is based upon section 9319, subdivision (a), which provides: "[F]or purposes of determining the rights of creditors of, and purchasers for value of goods from, a consignee, *while the goods are in the possession of the consignee,* the consignee is deemed to have rights and title to the goods identical to those the consignor had or had power to transfer." (Italics added.)

It was Fariba's position that under section 9319, subdivision (a), DSC did not have the right to seize the 14 vehicles because they were already in the possession of Fariba, not CASL. DSC, by contrast, argued that it obtained possession of the vehicles prior to Fariba, and therefore it had the right to seize the vehicles.

However, DSC provides no authority for the position that to have possession one must have "physical" custody and control. Accordingly, it has forfeited this claim on appeal. (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 366, fn. 2 [87 Cal.Rptr.2d 654, 981 P.2d 499].)

Moreover, DSC's proposed definition is unduly restrictive. Black's Law Dictionary defines "possession" as follows: "Having control over a thing with the intent to have and to exercise such control. [Citation.] The detention and control, or the manual or ideal custody, of anything which may be the subject of property, for one's use and enjoyment, either as owner or as the proprietor of a qualified right in it, and either held personally or by another who exercises it in one's place and name." (Black's Law Dict. (6th ed. 1990) p. 1163, cols. 1–2.)

■    Thus, contrary to DSC's contention, to have possession of something, it is *not* necessary to have *physical* custody and control. It is sufficient to have actual custody and control, with the intent of exercising such control. The court did not err in instructing the jury on the issue of possession.

### D.  Sufficiency of the Evidence of Fariba's Possession

DSC asserts that even if the court properly instructed the jury on the definition of possession, the verdict must be reversed because there is no substantial evidence Fariba had possession of the 14 vehicles. This contention is unavailing.

The record reflects that on July 10, 2006, Fariba terminated his business relationship with CASL and revoked its authority to sell any of his vehicles. At that time, Fariba held title to all of his vehicles on CASL's lot. On the morning of July 13, Fariba's vehicles were separated from the remainder of CASL's inventory. That morning, CASL gave the keys to all of Fariba's vehicles to Fariba's personnel, making them inoperable without Fariba's consent. CASL's owners testified that CASL was divested of care, custody and control of the vehicles when CASL gave Fariba the keys. Control was with Fariba, as nothing thereafter prevented him from driving the cars off CASL's lot. Indeed, Fariba's driver moved about 31 of his vehicles off CASL's lot prior to DSC seizing the 14 that are the subject of this litigation. From all this evidence, a jury could reasonably conclude that as of the morning of July 13, and before DSC seized 14 of his vehicles, Fariba had "actual custody and control," and thus, possession, of all of his vehicles.

DSC focuses on the fact it actually obtained physical possession of the 14 vehicles by moving them off CASL's lot before Fariba could do so. However, the jury could reasonably conclude, based upon the evidence summarized above, that Fariba had custody and control of the vehicles first, and DSC took the vehicles from *Fariba*, not CASL.

## II. *FARIBA'S APPEAL*

Fariba asserts the court erred in granting DSC's motion for directed verdict on his claim for punitive damages and on his fraud and breach of contract counts. However, he also concedes that if we affirm the jury's verdict in this matter, we need not reach that portion of his appeal directed at the fraud and breach of contract causes of action, as he was made whole by the damages awarded at trial.

We first conclude that the court did not err in granting a directed verdict on Fariba's punitive damages claim. Further, because we have upheld the jury verdict in this matter, we need not determine if the court erred in granting a directed verdict on his causes of action for fraud and breach of contract.

### A. *Punitive Damages*

#### 1. *Standard of review*

"In ruling upon a defense motion for a directed verdict, the trial court is guided by the same standard used in evaluating a motion for a nonsuit." (*Quinn v. City of Los Angeles* (2000) 84 Cal.App.4th 472, 479 [100 Cal.Rptr.2d 914].) Thus, a directed verdict is properly entered when " 'the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor.' " (*Id.* at pp. 479–480.) " ' "In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded." ' " (*Id.* at p. 480.) "A directed verdict is . . . subjected to de novo appellate review" and " ' "is in the nature of a demurrer to the evidence, and is governed by practically the same rules, and concedes as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom." ' " (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210 [77 Cal.Rptr.2d 660].)

#### 2. *Analysis*

Civil Code section 3294, subdivision (a) provides: "In an action for the breach of an obligation not arising from contract, where it is proven by *clear*

*and convincing evidence* that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." (Italics added.)

Fraud in the context of punitive damages means "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant *with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.*" (Civ. Code, § 3294, subd. (c)(3), italics added.)

On appeal from the grant of a directed verdict on the claim for punitive damages we must affirm the trial court's order if "no reasonable jury could find plaintiff's evidence to be clear and convincing proof of malice, fraud or oppression." (*Hoch v. Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 60–61 [29 Cal.Rptr.2d 615].)

Fariba's claim for punitive damages is based upon the allegation that Colli engaged in fraud in obtaining the keys to the vehicles DSC was in the process of repossessing. However, regardless of the means by which DSC obtained the keys to the vehicles, as the court noted, this was a commercial dispute between two parties, who both believed they were entitled to possession, based upon their competing interests in the vehicles. There is no clear and convincing evidence DSC knew Fariba's interest was superior to its own. Rather, as detailed, *ante*, resolution of this issue turned upon interpretation of the Uniform Commercial Code and proof that DSC had actual knowledge CASL was engaged in selling automobiles that belonged to others, an issue of first impression in California. Thus, there was no clear and convincing evidence DSC intended to deprive Fariba of his property or legal rights, or otherwise to cause injury. The court did not err in granting DSC's motion for directed verdict on the punitive damages claim.

B.  *Fraud and Breach of Contract Claims*

Fariba concedes that if we uphold the jury's verdict, he has been made whole by the compensatory damages awarded at trial, and we need not address his claim the court erred in granting a directed verdict on his causes of action for fraud and breach of contract. Accordingly, we decline to address these issues.

## DISPOSITION

The judgment is affirmed. Fariba shall recover his costs on appeal.

Benke, Acting P. J., and Haller, J., concurred.

The petition of appellant Dealer Services Corporation for review by the Supreme Court was denied January 21, 2010, S177988.